UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

| | | |
|---|---|---|
| ROSALINO PEREZ-BENITES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.1: 07-cv-1048 |
| v. | ) | |
| | ) | |
| CANDY BRAND, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEFENDANTS' BRIEF IN SUPPORT OF
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT

Come now the Defendants, Candy Brand, LLC, Arkansas Tomato Shippers, LLC, and

Charles Searcy, and for their Brief, state as follows:

**1.  Introduction:** Defendant, Candy Brand, LLC (hereinafter Candy Brand), operated a

tomato farming and packing operation in and around Hermitage, Arkansas for the years 2003 through

2007.  Candy Brand was a joint venture between Defendant, Arkansas Tomato Shippers, LLC

(hereinafter ATS) and Randy Clanton Farms, Inc. (hereinafter Clanton Farms).  ATS owned a

tomato packing facility at Hermitage, which was leased to Candy Brand each year during the tomato

harvest.  Clanton Farms owned or had under lease tomato farming acreage upon which Candy Brand

grew and harvested tomatoes.  Candy Brand employed farm workers from Mexico, under temporary

H-2A visas.  Some workers were employed in the packing shed and others were employed in the

fields, harvesting tomatoes.  Occasionally, selected field workers would do additional work in the

packing sheds, after a days work harvesting was completed.  However, packing shed workers did not

work in the fields harvesting tomatoes.  Following the 2007 tomato season, Candy Brand ceased its

operations, due primarily  a poor crop year and the decision of Charles Searcy to withdraw as a

managing member of ATS.  Even though Candy Brand has not been actively engaged in the tomato

farming or packing operation since 2007, it remains a viable limited liability company.   *See,*
*Affidavit of Charles Searcy.*

      2. **Plaintiffs' Claims:** Plaintiffs filed their First Amended Complaint on November 30,
2007.  Count I of the First Amended Complaint alleges a collective action under the Fair Labor
Standards Act (hereinafter FLSA) and makes the following claims:

      (a)      Failure to pay minimum wages (para. 59); and,

      (b)      Failure to pay overtime wages for packing shed workers (para. 60).

Count II of the First Amended Complaint alleges breach of employment contract, and makes the
following claims:

      (a)      Failure to pay the adverse effect wage rate (para. 66 [a]);

      (b)      Failure to comply with minimum wage and overtime provisions of the FLSA, as
            required by the contract (para. 66[b]);

      (c)      Failure to keep accurate records regarding the workers' earnings (para. 66[c]); and,

      (d)      Failing to furnish workers with accurate earnings statements (para. 66[d]).

The Court conditionally certified an FLSA collective action on October 31, 2008.  Plaintiffs have
filed their Motion seeking class certification of their breach of contract claims, which is pending and
has yet to be ruled upon by the Court.

      The parties have conducted extensive discovery, including the production by Candy Brand
of all of its corporate records and the depositions of numerous Candy Brand supervisory and
administrative employees.  Defendants have also responded to extensive written discovery requests
from Plaintiffs.  Defendants now seek summary judgment as to Plaintiffs' FLSA claims contained
in both Counts I and II.

3.   **Minimum Wage Claims:** Plaintiffs allege that they were not paid the federally established minimum wage during their first week of working for Candy Brand each season. This theory is based upon the allegation that the Plaintiffs incurred expenses for transportation, sustenance, and recruitment fees prior to arriving on the job to work for Candy Brand each season. The Plaintiffs contend that these expenses were primarily for the benefit of Candy Brand and when they are deducted from the Plaintiffs' first week of wages, the pre-employment expenses caused Plaintiffs' first week's pay to fall below the applicable minimum wage. Plaintiffs' theory is based upon the holding of *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228 (11th Cir. 2002) and subsequent cases following its holdings. However, as will be described herein, *Arriaga* is not the controlling law at this time.

(a)   **The Arriaga Case:**  *Arriaga v. Florida Pacific Farms, LLC* held that the incoming transportation costs of the H-2A employee was incident of and necessary to the employment of H-2A workers, and therefore, primarily for the benefit of the employer. *Arriaga* further held that the employer of H-2A workers was also responsible for the visa costs, visa application fees, and immigration fees for entry documents, up to the amount necessary to comply with minimum wage. *Arriaga* held that these pre-employment expenses were defacto deductions from the employees' first week of wages. Therefore, if the defacto deductions caused the first week wages to fall below the applicable minimum wage, the employer was required to reimburse those expenses, up the point of equaling the minimum wage. *Arriaga* imposed these requirements on H-2A employers, in spite of the fact that it recognized a Department of Labor contract was in place between the employers and the H-2A employees, which required the employer to reimburse the H-2A workers for inbound transportation and sustenance cost, if and when the worker completed fifty percent (50%) of the contract work. *Arriaga* did hold that the employers were not liable for the recruitment fees workers

paid to parties in their home country, to obtain temporary visas for employment in the United States, absent proof of an agency relationship between the employers and the third parties in the foreign country charging the recruitment fees. *See*, *Arriaga*, 305 F.3d 1228.

Arriaga set off a virtual cottage industry of FLSA claims against H-2A employers, which has swept across the nation. The *Arriaga* reasoning was adopted in an Arkansas case, *Bautista v. D&S Produce*, 447 F.Supp. 2d 954 (Ark. 2006). However, the Court in *Bautista* declined to include the hotel expenses incurred in the course of obtaining visas in Mexico as costs of the employer.

**(b) DOL Response to Arriaga:** Recently, the holding of *Arriaga* and subsequent cases have become a political polemic which has invaded the federal court system. In December 2008, the United States Department of Labor (hereinafter DOL) adopted amendments to its rules regarding the H-2A worker program, which became effective January 17, 2009. *See*, *Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement; Final Rule*, 73 Fed. Reg 77110 (Dec. 18, 2008) (hereinafter the "2008 Rule"). The 2008 Rule criticized and in effect neutered the holding of *Arriaga* and its progeny. The 2008 Rule went so far as to state that *Arriaga* was "wrongly decided". 73 Fed. Reg. 77150. The following quotations appear in the 2008 Rule:

> After due consideration of the comments, the Department has determined to continue the current policy of requiring employers to provide or pay for workers' inbound and outbound subsistence and transportation and the corresponding requirement for reimbursement of such inbound costs upon the worker's completion of 50 percent of the work contract period. Thus, reimbursement at the 50 percent point is all that the Final Rules requires pursuant to the Department's Rulesmaking authority under the INA. Moreover, the Department believes that the better reading of the FLSA and the Department's own regulations is that relocation costs under the H-2A program are not primarily for the benefit of the employer, that relocation costs paid for by H-2A workers do not constitute kickbacks within the meaning of 29 CFR 531.35, and that reimbursement of workers for such costs in the first paycheck is not required by the FLSA.

The Department does not believe that an H-2A worker's payment of his or her own relocation expenses constitutes a "kick-back" to the H-2A employer within the meaning of 29 CFR 531.35.

Both as a general matter and in the specific context of guest worker programs, employee relocation costs are not typically considered to be "primarily for the benefit" of the employer. Rather, in the Department's view, an H-2A worker's inbound transportation costs either primarily benefit the employee, or equally benefit the employee and the employer. In either case, the FLSA and its implementing regulations do not require H-2A employers to pay the relocation costs of H-2A employees. *Arriaga* misconstrued the Department's regulations and is wrongly decided.

Foreign workers seeking employment under the H-2A nonimmigrant visa program often travel great distances, far from family, friends, and home, to accept the offer of employment. Their travel not only allows them to earn money – typically far more money than they could have in their home country over a similar period of time – but also allows them to live and engage in non-work activities in the U.S. These twin benefits are so valuable to foreign workers that these workers have proven willing in many instances to pay recruiters thousands of dollars (a practice that the Department is now taking measures to curtail) just to gain access to the job opportunities, at times going to great lengths to raise the necessary funds. The fact that H-2A farmworkers travel such great distances and make such substantial sacrifices to obtain work in the United States indicates that the travel greatly benefits those employees.

The Department obligated H-2A employers to pay H-2A workers' transportation costs not because it believed that the workers were entitled to such payments under the FLSA, but rather in the discharge of its responsibilities under the INA to insure the integrity of the H-2A program. The Department carefully crafted its regulation to give H-2A workers a strong incentive to complete at least 50 percent of their work contract. The practical effect of the *Arriaga* decision, however, is to require H-2A employers to pay for H-2A workers' inbound transportation costs without any reciprocal guarantee that the workers will continue to work for the employer after the first workweek. The Department believes that the payment of such transportation costs unattached to a reciprocal guarantee that the needed work will ultimately be performed substantially diminishes the benefit of the travel to the employer, and certainly would not allow the travel to be considered primarily for the employer's benefit.

In sum, the Department believes that the costs of relocation to the site of the job opportunity generally is not an "incident" of an H-2A worker's employment within the meaning of 29 CFR 531.32, and is not primarily for the benefit of the H-2A employer. The Department has publicly stated that "in enforcing the FLSA for H-2A workers, the Department's general policy is to ensure that workers receive

transportation reimbursement by the time they complete 50 percent of their work contract period (or shortly thereafter) rather than insisting upon reimbursement at the first pay period." The Department continues to believe that this is the appropriate interpretation of the interplay between the H-2A program regulations and the FLSA in regards to transportation reimbursement. The Department states this as a definitive interpretation of its own regulations and expects that courts will defer to that interpretation.

73 Fed. Reg. 77149 - 77151.

Almost immediately, several farm workers' unions sought injunctive relief to prevent the implementation of the 2008 Rule. However, the unions' efforts to enjoin the implementation of the 2008 Rule failed. *See*, *United Farm Workers v. Chao*, 593 F.Supp. 2d 166 (D. of Col., 1-15-09). Therefore, the 2008 Rule became effective January 17, 2009.

However, President Obama had taken office and appointed the new Secretary of Labor Solis. On March 17, 2009, the DOL issued a notice of proposed rule making, proposing to suspend the 2008 Rule for nine months and reinstate the prior rule. *See, Temporary Employment of H-2A Aliens in the United States,* 74 Fed. Reg. 11408 (March 17, 2009). The suspension of the 2008 Rule was to become effective May 29, 2009. On May 29, 2009, the DOL issued a new H-2A Final Rule, suspending the 2008 Rule and reinstating the prior rule, effective June 29, 2009. *See, Temporary Employment of H-2A Aliens in the United States,* 74 Fed. Reg. 25972 (May 29, 2009). On March 26, 2009, the DOL announced its withdrawal "for further consideration" of the 2008 Rules' interpretation of the FLSA and *Arriaga* decision. *See*, *Withdrawal of Interpretation of the Fair Labor Standards Act Concerning Relocation Expenses Incurred by H-2A and H-2B Workers*, 74 Fed. Reg. 13261 (March 26, 2009).

Following the DOL's notice of intention to withdraw the 2008 Rule, a group of H-2A employers filed suit against the Secretary of Labor and DOL, seeking to enjoin the DOL's suspension of the 2008 Rule, based upon the DOL's failure to follow its own rule-making authority. On June

29, 2009, the Federal District Court in North Carolina enjoined the DOL from suspending the 2008

Rule, thereby leaving intact the 2008 Rule, which became effective January 17, 2009.  *See, North*

*Carolina Growers Assn., Inc. v. Solis*, 644 F. Supp. 2d 664 (U.S.D.C., N. Car. 2009).

Defendants filed their original Motion for Partial Summary Judgment in December, 2009.

Since that time, the DOL issued new regulations, referred to as the "2010 Final Rule."  *See*,

Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg.6884

(effective 3/15/10).  The 2010 Final Rule abrogated the criticism of *Arriaga* contained in the 2008

Rule.  Therefore, factual issues remain regarding Plaintiffs' *Arriaga* claims.

4.  **Overtime Claims:** Plaintiffs claim that all packing shed workers, including both H-2A

and domestic workers, are entitled to overtime pay for each hour worked over 40 hours per week.

Defendants contend that the packing shed workers are not entitled to overtime pay under the FLSA,

because Candy Brand is entitled to the agriculture exemption for its packing shed activities.

> Among the FLSA's provisions is a general requirement that employers pay overtime. Employers may not employ workers for a "workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *29 U.S.C. § 207(a)(1)*. Like many broad rules in the law, this general proposition has numerous exceptions. Relevant here is an exemption for agricultural employees ... Exemptions to the FLSA are "narrowly construe[d]." *Pacheco v. Whiting Farms, Inc., 365 F.3d 1199, 1203 (10th Cir. 2004)*. "An employer bears the burden of showing its practices plainly and unmistakably fall within the exemption." *Id*. Under *§ 213(b)(12)*, certain employees "employed in agriculture" are exempt from the overtime provisions. Agriculture is defined as including
>
>> farming in all its branches  and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

*29 U.S.C. § 203(f)*. A number of court decisions have examined the scope of the agricultural exemption. The Supreme Court of the United States explained in *Farmers Reservoir & Irrigation Co. v. McComb* that the statutory definition of agriculture embraces two related concepts: (i) primary agriculture; and (ii) secondary agriculture. *See 337 U.S. at 762-63*.

> First, there is the primary meaning. Agriculture includes fanning in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning.  Second, there is the broader meaning. Agriculture is defined to include things other than farming as so illustrated. It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with "such" farming operations.

*Id*. Although exemptions are narrowly construed, "[t]he agricultural exemption was meant to apply broadly and to embrace the whole field of agriculture." *Pacheco v. Whiting Farms, Inc., 365 F.3d at 1203 ...*

As a result of the bifurcated definition of agriculture, activities that are not themselves agricultural may nonetheless qualify for the exemption. *See id. at 1204*. For example, the packaging of chicken pelts for shipment is incidental to the agricultural activity of raising chickens for skinning and thus exempt. *See id*. The United States Court of Appeals for the Seventh Circuit has held that work connected with the sale of flower pots by a nursery is exempt. *See Adkins v. Mid-American Growers, Inc., 167 F.3d 355, 357 (7th Cir. 1999)*. Ultimately, "the question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity." *Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. at 761*.

*Solis v. Conley's Nursery & Landscaping, Inc.*, 641 F. Supp. 2d 1200, 1205-1206 (U.S.D.C. N.M., 2009).

Candy Brand's packing shed is operated as a part of and in conjunction with Candy Brand's farming operation.  The packing shed only operates during those times of year when Candy Brand's tomato crop is being harvested.  Candy Brand did not pack tomatoes for other farmers for a fee.  The vast majority of the tomatoes packed in the shed are grown by Candy Brand.  Occasionally, Candy Brand purchased tomatoes from other farmers to fill orders with its customers.  Most of the tomatoes purchased from other farmers did not require "repacking" by shed employees, as they arrived ready

to ship.  However, some number of tomatoes purchased from other farmers were repacked in Candy Brand boxes by the packing shed employees.  Those repacking operations were of such small proportions that Candy Brand could not feasibly employ a separate work force to handle the repacking of tomatoes purchased from other farmers.  *See*, *Affidavit of Charles Searcy*.  Apparently, Plaintiffs believe that the small amount of repacking other farmers' tomatoes destroys the agricultural exemption for Candy Brand.

Defendants admit that as a general rule, purchasing crops from other farmers, for resale, does not meet the definition of agriculture.  *See, Marshall v. Gulf & Western Ind., Inc.,* 552 F.2d 124 (5th Cir., 1977); *Roebuck v. Hudson Valley Farms,* 239 F. Supp. 2d 234 (U.S.D.C. N.Y., 2002).  In order for the secondary agricultural exemption to apply, the work must be related to the operation of the same farm on which the employee works.  *Saldibar v. Delray One, Inc.*, 2008 U.S. Dist. LEXIS 27402 (Fla.).  However, when the non-exempt work is of slight impact and interrelated to the farmer's operation, both the case law and regulations regarding H-2A workers have carved out an exception known as the "de minimis doctrine".

> *Adkins v. Mid-American Growers., Inc*. also illustrates the working of the de minimis doctrine. As the Seventh Circuit explained:
>
>> The underlying reason why the agricultural exemption includes some nonagricultural activity is that it is not always feasible to separate agricultural from nonagricultural labor. The problem is illustrated by flowers that are sold in pots. If a worker works on such a product more than 40 hours a week, is the overtime agricultural or nonagricultural? It is both, but since the nonagricultural component is minor and inseparable, and since the FLSA does not permit overtime pay to be prorated for a worker who does both exempt and nonexempt work, the employer is given a break and the work classified as entirely agricultural. To deny him the break would burden the efficient integration of closely related activities, especially in situations in which the amount of nonexempt activity is too slight to warrant the expense of a separate work force. But where the nonexempt activity can be feasibly separated from the exempt, the separation is essential to prevent agricultural enterprises from obtaining an artificial competitive advantage over enterprises that do not enjoy an exemption from the Fair Labor Standards Act.

*Adkins v. Mid-American Growers, Inc., 167 F.3d at 358* (citations omitted).

In *Walling v. Rocklin, 132 F.2d 3 (8th Cir. 1942)*, the United States Court of Appeals for the Eighth Circuit held that a flower business that had five to ten percent of its total sales coming from product that was bought from others to cover shortfalls was entitled to the agricultural exemption. As the Eight Circuit put it:

> [T]he occasional purchase and sale of products necessitated by reason of storms, frost, and other emergencies, caused by the natural elements as shown by the record is, we think, quite consistent with the theory that defendants are primarily and exclusively engaged in agriculture in the production of flowers, plants, flowering shrubs, ornamental grasses, etc., necessary to meet the wants of purchasers of flowers and floral designs and tributes.

*Id. at 7* (internal quotation marks omitted). *Accord Wirtz v. Jackson & Perkins Co., 312 F.2d at 51* (holding that nursery's occasional purchase of outside stock to make up for shortages from nursery's crop failures was in conjunction with nursery's farming operation and thus within agricultural exemption). In *Damutz v. William Pinchbeck, Inc., 158 F.2d 882 (2d Cir. 1947)*(per curiam), the United States Court of Appeals for the Second Circuit held that, under the de minimis doctrine, an employer did not lose its exemption when "a small part of the defendant's business, less than one-half of one per cent, had been the marketing on a commission basis of cut flowers obtained from another grower." *Id. at 883*.

*Solis v. Conley's Nursery & Landscaping, Inc.*, 641 F. Supp. 2d 1200, 1207-1208.

The 2008 Rule (73 FR 77110) took an expansive view of what constituted agricultural labor for H-2A workers. The 2008 Rule defines agricultural labor or services to specifically include handling, packing, grading, and delivery to storage of any agricultural commodity in its unmanufactured state, while employed by the operator of a farm, "but only if such operator produced more than one-half of the commodity with respect to which such service is performed." *Id.,* at 77234. The 2010 Final Rule retains this 50% requirement. 75 Fed. Reg. at 6962. The 2010 Final Rule also allows up to 20 farmers to join together to operate a packing facility, if the farmers produce all of the commodity worked on. 75 Fed. Reg. at 6962.

The Affidavit of Charles Searcy makes clear that Candy Brand shed workers only repacked tomatoes purchased from other farmers, when necessary, to cover orders for Candy Brand customers. This was infrequent and only required a small amount of time in any given year. These facts are supported by the deposition testimony of the opt-in Plaintiffs whom Plaintiffs' counsel chose for deposition. Maria Mireya Cortes Gonzalez worked in the Candy Brand packing shed in 2004, 2005, and 2006. (Gonzalez Depo., p. 10). She admits she never repacked tomatoes; but spent one day over the course of three years, placing Candy Brand labels on top of other labels on plastic containers of tomatoes. (Gonzalez Depo., p. 68). Jose Delores Ramirez Reyes worked in the Candy Brand packing shed each year Candy Brand was operating, 2003 - 2007. (Reyes Depo., p. 10). Reyes claims to have repacked tomatoes on one occasion, for only a few hours, over the course of five years. (Reyes Depo., p. 63-64). Blas Burboa Leyva worked in the packing shed in 2005 and 2006. (Leyva Depo., p. 10). Mr. Leyva remembered repacking some tomatoes shipped in from other locations, but could not remember when or the number of days he spent repacking these tomatoes. (Leyva Depo., P. 53-54). Defendants submit that these types of small and infrequent handling of tomatoes grown by other farmers does not defeat the agricultural exemption per the de minimis doctrine, or the 2008 Rule.

   5.   **Breach of Contract Claims:** Defendants have now understood that Plaintiffs are attempting to hold Defendants other than Candy Brand, liable on the breach of contract claims. The statute of limitations under the FLSA is two (2) years, which may be extended to three (3) years, if the Court finds a willful violation. 29 U.S.C. § 255. The FLSA also allows individuals or entities, other than the actual employer, to be held responsible for the FLSA violations, if they meet certain control criteria. Here, Candy Brand was the actual employer of all Plaintiffs, pursuant to the H-2A regulations and the contract issued to each Plaintiff. However, Plaintiffs also allege that each other Defendant in the litigation is a "joint employer," pursuant to the FLSA. Defendants' counsel has

learned through conversation with counsel for Plaintiffs, that Plaintiffs contend that the Defendants ATS, Clanton, Searcy, and Lisenby are subject to claims for breach of contract, extending back the full five (5) years of the statute of limitations for written instruments.

The FLSA contains its own two (2) year statute of limitation (three (3) years for willful violations) as embodied in the statute. 29 U.S.C. § 255. It is only under the FLSA theory of control that any defendant other than Candy Brand can be held responsible for violations as a joint employer. Plaintiffs attempt to avail themselves of the longer, 5 year, statute of limitations for contracts in their effort to impose liability on the defendants other than Candy Brand. It is only under the FLSA that the other defendants can be held responsible for the damages of Plaintiffs and those by statute are limited to either 2 or 3 years. In a recent case dealing with the FLSA, the District Court of Missouri held that state law was not applicable where a federal claim is at issue and there is a federal statute of limitations for that claim. *Muhammad v. Wilkins Group, Inc.*, 2009 U.S. Dist. LEXIS 81064 (Mo., 2009), quoting *Garfield v. J.C. Nichols Real Estate*, 57 F.3d 662 (8th Cir., 1995).

It is axiomatic that shareholders, officers, or employees of a corporate entity are not a proper party relative to a breach of contract claim against the corporate entity. The corporation is a legal entity, distinct from its members, which owns the corporate property and owes the corporate debt, and is the proper party to be sued. Generally, individual defendants would not even be permitted to defend in their individual capacity for breach of contract claims against a corporate entity. *See*, *Arkansas Iron & Metal Company v. First Nat'l Bank of Rogers*, 16 Ark. App. 245; 701 S.W.2d 380 (1985); *Marcum v. Wengert*, 344 Ark. 153; 40 S.W.3d 230 (2001); *Chism v. CNH America, LLC*, 2008 U.S. Dist. LEXIS 12639 (Ark., 2/20/08). Because the remedies allowing parties other than the actual employer to be held responsible are limited by the FLSA, under its own statute of limitations, Plaintiffs may not avail themselves of those remedies, pursuant to the longer contract statute of limitations. Plaintiffs may pursue their breach of contract claims against Candy Brand, LLC, the

party contracting with them for employment.  However, Plaintiffs cannot use the FLSA theory of

joint employers outside of the statute of limitations provided for those remedies.   That the

Defendants, Arkansas Tomato Shippers, LLC and Charles Searcy are entitled to a judgment as a

matter of law as it relates to the breach of contract claims filed herein.

　　　　　**6.   Standard for Summary Judgment:** This Court has recently set forth the standard for

review on summary judgment:

> The standard of review for summary judgment is well established. The Federal Rules
> of Civil Procedure provide that when a party moves for summary judgment;
>
>> The judgment sought shall be rendered forthwith if the pleadings,
>> dispositions, answers to interrogatories, and admissions on file, together with
>> affidavits, if any, show that there is no genuine issue as to any material fact
>> and that the moving party is entitled to a judgment as a matter of law.
>
> *Fed.R.Civ.P. 56(c)*; *Krenik v. County of LeSueur, 47 F.3d 953 (8th Cir. 1995)*. The
> Supreme Court has issued the following guidelines for trial courts to determine
> whether this standard has been satisfied:
>
>> The inquiry performed is the threshold inquiry of determining whether there
>> is a need for trial-whether, in other words, there are genuine factual issues
>> that properly can be resolved only by a finder of fact because they may
>> reasonably be resolved in favor of either party.
>
> *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202*
> *(1986). See also Agristor Leasing v. Farrow, 826 F.2d 732 (8th Cir. 1987)*; *Niagara*
> *of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund, 800*
> *F.2d 742, 746 (8th Cir. 1986)*.  A fact is material only when its resolution affects the
> outcome of the case. *Anderson v. Liberty Lobby, Inc., 477 U.S. at 248*. A dispute is
> genuine if the evidence is such that it could cause a reasonable jury to return a verdict
> for either party. *Id. at 252*.
>
> The Court must view the evidence and the inferences that may be reasonably drawn
> from the evidence in the light most favorable to the nonmoving party. *Enterprise*
> *Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996)*. The moving party bears the
> burden of showing that there is no genuine issue of material fact and that it is entitled
> to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the
> existence of specific facts in the record that create a genuine issue for trial. *Krenik*
> *v. County of LeSueur, 47 F.3d at 957*. A party opposing a properly supported motion
> for summary judgment may not rest upon mere allegations or denials, but must set

forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.*

*Gill v. Conagra Poultry Company, et al*, 20008 U.S. Dist. LEXIS 76544.

It is clear that Candy Brand is entitled to the agricultural exemption from overtime wages. That exemption is not defeated by the small amount of produce purchased from other farmers and repacked by the packing shed, both pursuant to the 2008 Rule, the 2010 Final Rule, and the de minimis doctrine.  As such, Defendants are entitled to partial summary judgment as to overtime claims of Plaintiffs.

Furthermore, Arkansas Tomato Shippers and Searcy are entitled to judgment as a matter of law on the Plaintiffs' breach of contract claims, as they were not the parties contracting for employment.

WHEREFORE, Defendants, Candy Brand, LLC, Arkansas Tomato Shippers, LLC, and Charles Searcy, pray that their Amended Motion for Partial Summary Judgment be granted, for their costs expended herein; for  a reasonable attorney's fee; and for all other just and proper relief to which they are entitled.

Respectfully submitted,

CANDY BRAND, LLC,
ARKANSAS TOMATO SHIPPERS, LLC,
AND CHARLES SEARCY

BY:     */s/ Hani W. Hashem*
        HANI W. HASHEM - 87076
        Hashem Law Firm, PLC
        437 West Conrad Street
        P. O. Box 739
        Monticello, AR 71657
        870-367-4223

-15-

## CERTIFICATE OF SERVICE

       I, Hani W. Hashem, do hereby certify that a copy of the above and foregoing Defendants' Brief in Support of Amended Motion for Partial Summary Judgment has been forwarded via electronic filing to the following on this 2nd day of August, 2010.

James M. Knoepp
Immigrant Justice Project
Southern Poverty Law Center
233 Peachtree Street NE, Suite 2150
Atlanta, GA 30303

Mr. Edward Tuddenham
Attorney at Law
228 W. 137th Street
New York, NY 10030

Mr. Charles "Skip" Davidson
Davidson Law Firm
P.O. Box 1300
Little Rock, AR 72203

Mr. Daniel Werner
Immigrant Justice Project
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104

Mr. John L. Burnett
Lavey and Burnett
904 W. 2nd Street
Little Rock, AR 72201

Mr. F. Mattison Thomas
103 East Main, Suite D
El Dorado, AR 71730

                         */s/ Hani W. Hashem*
                         HANI W. HASHEM