UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

_____
                                    )
ROSALINO PEREZ-BENITES, et al.,     )
                                    )
        Plaintiffs,                 )
                                    )        Case No. 1:07-cv-1048
v.                                  )
                                    )        Judge Barnes
CANDY BRAND, LLC, et al.,           )
                                    )        Class Action
        Defendants.                 )
_____)

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
RELATED TO VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
AND THE H-2A EMPLOYMENT CONTRACT

## I.    INTRODUCTION

The three named Plaintiffs in this case are agricultural workers and Mexican

nationals who were employed in the Defendants' tomato farming and packing shed

operations in and around Bradley County, Arkansas, pursuant to H-2A temporary

guestworker visas.  (First Am. Compl. ¶¶ 18, 29-30.)  The Plaintiffs bring claims

on behalf of themselves and others similarly situated for violations of the Fair

Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, and for breach of their H-2A

employment contracts.  (First Am. Compl. ¶¶ 63-68.)  On October 31, 2008, the

Court granted preliminary certification of Plaintiffs' Count I FLSA claims as an

opt-in class pursuant to 29 U.S.C. § 216(b).  (Doc. 66.)  The 97 individuals who

have consented to participate in the FLSA claim now seek partial summary judgment with respect to their FLSA claims based on: (1) Defendants' failure to pay them the FLSA minimum wage during their first workweeks by not reimbursing them for expenses incurred for the benefit of the Defendants, and (2) Defendants' failure to pay packing shed workers overtime wages. Summary judgment is also sought to establish that: (3) the three-year statute of limitations applies to the FLSA claims, and (4) the Plaintiffs and opt-in Plaintiffs are entitled to liquidated damages.

On March 23, 2010, the Court certified two Rule 23(b)(3) classes seeking relief for the Count II breach of contract claims, consisting of: (1) all non-supervisory workers employed by Defendants at any time between 2003 and the date of judgment in this matter who were employed pursuant to H-2A temporary work visas, and (2) all non-supervisory workers employed in Defendants' packing shed operations at any time between 2003 and the date of judgment in this matter—irrespective of visa status—who did not receive overtime pay during workweeks when they worked more than forty (40) hours. (Doc. 174.) On May 20, 2010, the Eighth Circuit Court of Appeals denied Defendants' petition for permission to appeal the order granting class certification. The Rule 23 class members now move for partial summary judgment with respect to the breach of their H-2A contracts based on: (1) Defendants' failure to pay Class I members the

proper Adverse Effect Wage Rate (AEWR) during their first workweek by not reimbursing them for expenses incurred for the benefit of the Defendants, and (2) Defendants' failure to pay Class I members the minimum wage during their first workweek by not reimbursing them for expenses incurred for the benefit of the Defendants, (3) Defendants' failure to pay Class II packing shed workers overtime wages, and (4) Defendants' failure to provide Class I members the proper amounts of transportation and subsistence payments at the 50% period of their H-2A contracts and upon completion of their H-2A contracts.

## II.   STANDARD OF LAW

Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A factual dispute is material only if it "might affect the outcome of the suit under the governing law," and it is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The party moving for summary judgment need only "bring up the fact that the record does not contain such an issue" and "identify that part of the record which bears out his assertion. Once this is done, his burden is discharged . . . ." Mt. Pleasant v. Associated Electric Cooperative, Inc., 838 F.2d 268, 273-74 (8th Cir. 1988). The mere argued existence of a factual dispute does not defeat an otherwise properly

supported motion.  See Matsushita Electric Industrial Co., Ltd v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.   SUMMARY OF FACTS

Defendant Candy Brand was a tomato grower and packer operating in and around Bradley County, Arkansas from 2003 through 2007.  The tomato season in Arkansas is quite short—usually about six to eight weeks from the start of the harvest season until the point at which all the tomatoes have been removed from the ground.  (Pls.' Facts ¶ 27.)  As a result, it was critical for Defendants to ensure a full, reliable, and readily-available workforce to meet their intense labor needs during the brief tomato season.  Tomato harvesting, like other agricultural work, involves arduous physical labor and long hours in the field.  (See, e.g., Exh. 102) (describing job requirements as "[a]ble to work in hot humid weather for extended periods of time, bending, stooping, and reaching . . . Physically able to lift up to 50 lbs. on a consistent basis throughout the workday.").  For this work, Defendants paid between $7.13 per hour in 2003 and $8.01 per hour in 2007, the Adverse Effect Wage rate set by the federal government.  See 68 Fed. Reg. 8929 (2003); 72 Fed. Reg. 7909 (2007).  As a result, Defendants were unable to find sufficient U.S. workers willing to fill these jobs, and instead met their labor needs through the H-2A foreign guestworker program.  The H-2A program provides a temporary visa to unskilled agricultural workers to work for a U.S. employer.  8 U.S.C. § 1188(a)(1);

20 C.F.R. § 655 et seq. (1987).[1]  Under this program, an employer seeking to hire foreign guestworkers must first certify that no U.S. workers are available to perform the temporary employment for which foreign workers are sought, and that the employment of the foreign workers will not adversely affect the wages and working conditions of U.S. workers.  8 U.S.C. § 1188(a)(1); 20 C.F.R. §655.90(b) (1987).

Employers seeking admission of H-2A workers must first file a temporary labor certification application with the United States Department of Labor (USDOL). 20 C.F.R. §§ 655.101(a)(1) and (b); §655.102 (1987) (specifying minimum terms which must be contained in the job offer).  The employer must complete and file both a form "ETA 750" Application for Alien Employment Certification and a form "ETA 790" Agricultural and Food Processing Clearance Order.  Together, these forms certify the wage rate the employer is required to pay to avoid adverse effects on U.S. workers, the number of H-2A workers the U.S. employer seeks to hire, the duties for which the H-2A workers will be employed, their work schedule, and the duration of the job.  Because the statutory mandate of

---

[1]  The 1987 regulations governing the H-2A program were in effect during the period relevant to this lawsuit.  In December, 2008, the USDOL issued revised regulations for the H-2A program, which were subsequently withdrawn in February, 2010.  The regulations currently in place are identical in substance to those in effect from 1987 through 2008, but some section numbers have changed.  To maintain consistency with prior filings in this case, Plaintiffs cite to the section numbers contained in the H-2A regulations from 1987 in this memorandum.

the H-2A program is to allow temporary employment of foreign workers only when an employer is unable to find sufficient U.S. workers, a prospective H-2A employer must also take certain steps to ensure that U.S. workers receive preference in hiring.  For example, the employer must assure the USDOL that it will engage in "positive recruitment" of U.S. workers.  20 C.F.R. § 655.103(d) (1987) (listing particular steps that an employer must take, including newspaper and/or radio advertising and assisting in preparing local, statewide, and interstate job orders); see also 20 C.F.R. § 655.105(d) (1987) (requiring USDOL to determine whether employer applying for H-2A certification has satisfied requirements for recruitment of U.S. workers).  Admission under an H-2A visa permits the guestworker to work only for the employer that filed the H-2A petition.  8 C.F.R. § 214.2(h)(2)(i)(D).  H-2A workers are exempt from Social Security and Medicare taxes, meaning that an employer does not need to pay its share of these taxes for the H-2A workers it employs.  (Pls. Facts ¶¶ 57-58.)

     During the period relevant to the lawsuit, Defendants were certified to employ approximately 1,800 H-2A workers.  (Exhs. 99, 102, 104, 107, 109, 113, 115, 119, 228, 229, 231, 235.)  As part of their annual application for permission to import H-2A workers, Candy Brand tested the local labor market and submitted recruitment reports to the USDOL indicating how many local workers they hired as a result of the recruitment efforts.  (Pls.' Facts ¶ 19-20.)  During the period of

2003-2007, Candy Brand's recruitment reports indicated that, with the exception of two local workers who were hired in 2003, no local workers came forward to seek the positions for which Candy Brand sought H-2A workers.  (Pls.' Facts ¶ 21.) Given that Candy Brand could not meet its labor needs through hiring of local workers, the employment of temporary H-2A workers from Mexico was critical to the company's survival.  (Pls.' Facts ¶¶ 22-25.)  As Defendants acknowledged on multiple occasions, had they been unable to hire H-2A workers, their businesses would have been unable to operate.  (Pls.' Facts ¶¶ 22-23, 25-26.) This was particularly the case because of the labor-intensive and time-sensitive nature of the tomato industry—as little as a one-week period without sufficient workers to harvest the crop could be devastating.  (Pls.' Facts ¶¶ 27-28.)  It is clear that the temporary H-2A workers who harvested and packed the tomatoes for sale were crucial to the functioning of Defendants' businesses, which would succeed or fail almost entirely during the six to eight week window of peak operations.

To ensure they assembled a sufficient number of H-2A workers to meet their labor needs, Defendants contracted with two outside companies—AgWorks, Inc. in 2003, and International Labor Management Corporation (ILMC) from 2004 through 2007—to process the required H-2A paperwork sent to the federal government and to serve as Defendants' agents in their interactions with the USDOL.  (Pls.' Facts ¶¶ 2, 11.)  For these services, Defendants paid AgWorks over

7

$26,000 in 2003 and ILMC $7,500 for each year from 2004 through 2007.  (Pls.'

Facts ¶¶ 3, 12.)  As part of their services as Candy Brand's agent in 2003,

AgWorks prepared and submitted all required governmental forms for Candy

Brand to obtain H-2A workers, ran newspaper advertisements for Candy Brand to

test the local labor market, prepared and sent reports to the USDOL with the results

of Candy Brand's local market recruitment efforts, prepared additional

immigration-related government forms associated with obtaining H-2A workers,

and made appointments at the U.S Consulate in Monterrey for Candy Brand's

workers to obtain their H-2A visas.  (Pls.' Facts ¶ 4.)  From 2004 through 2007,

ILMC performed similar services for Candy Brand.   (Pls.' Facts ¶ 14.)

     While AgWorks or ILMC performed these tasks on behalf of Defendants on

the U.S. side, Candy Brand also needed to ensure that H-2A workers were

recruited and assembled from the Mexican side.  Candy Brand did its own

recruitment and hiring of H-2A workers from 2003 through 2007.  (Pls.' Facts ¶

30.)  Typically, an individual interested in working at Candy Brand in Arkansas

would contact an employee who had previously worked for Defendants, often a

crew supervisor in Defendants' field operations, who would in turn send a list of

potential workers to Candy Brand office manager Kristi Clanton.[2]  (Pls.' Facts ¶

---

[2] While there is a dispute as to whether and how much potential workers had to pay
Defendants' crew leaders to get their names on the list of eligible workers, it is

32.)  As a required step in the process of securing employment at Candy Brand,

prospective H-2A workers had to obtain passports from the Mexican Ministry of

Foreign Affairs, at a cost of approximately $30, as it was uncommon for H-2A

workers to have passports prior to purchasing them for the purpose of working at

Candy Brand.  (Pls.' Facts ¶ 46-47.)  After Ms. Clanton received the lists of

workers from Mexico, she provided AgWorks or ILMC with typed versions of the

lists (Pls.' Facts ¶¶ 30, 32) to be passed to their agents in Mexico who would assist

with processing the visa application forms and other paperwork.

In 2003, Defendants' agent AgWorks helped Candy Brand coordinate with

Solstice International Consultants, LLC ("Solstice International") to assist with the

processing of H-2A workers' visas at the U.S. consulate in Monterrey, Mexico,

and to assist with transporting H-2A workers from Monterrey to the United States.

(Pls'. Facts ¶ 5.)  Solstice International charged H-2A workers $50 each for its visa

processing services.  (Pls.' Facts ¶ 6.)  Candy Brand was aware that H-2A workers

had to pay this fee.  (Pls.' Facts ¶ 7.)   From 2004 through 2007, ILMC and Candy

Brand worked with Manpower of the Americas (MOA) or Consular Services

International (CSI) to process prospective H-2A workers' visa paperwork and

handle the Consular interactions in Monterrey.  (Pls.' Facts ¶ 13.)  Candy Brand H-

2A workers were required to contact a designated MOA or CSI agent and pay a

─────────────────────

undisputed that such lists were compiled in Mexico and received in the Candy
Brand offices in Hermitage, Arkansas.  (Pls.' Facts ¶¶ 30-32.)

number of fees upfront, including a fee of $145 for visa processing. (Pls.' Facts ¶¶ 41, 42; Exhs. 7, 122.) Candy Brand was aware that workers had to pay these fees as a required step in the process of obtaining an H-2A visa to work for Defendants. (Pls.' Facts ¶ 43; Exh. 122) (showing Defendants' acknowledgment of costs that H-2A workers incurred, including the $145 agent fee).) Indeed, Candy Brand communicated directly with ILMC on multiple occasions during each season to coordinate sending H-2A workers to the MOA or CSI agent to pay the fees. (Pls.' Facts ¶ 39; Exh. 135 (e-mail from K. Clanton to ILMC) ("[B]e sure and let me know when to have the workers go to the agent in Morelia to complete papers and pay their money"); Exh. 141 (e-mail from K. Clanton to ILMC) (". . . need more info on what to tell these people about what to do. They all have paid an agent and were told to go to Monterrey by the agent.").) In addition, Candy Brand's operations manual specifically discussed the process of sending workers to agents in Mexico for visa processing and listed the contact information for the MOA representative in Monterrey. (Exh. 10 at section 5.1.) MOA and CSI earned money by collecting fees directly from H-2A workers and did not charge ILMC or Candy Brand for assistance with H-2A visa processing fees in Mexico. (Pls' Facts ¶ 40.) If a prospective H-2A worker failed to contact the MOA or CSI agent and pay the required $145 visa processing fee, he or she would be ineligible to receive an H-2A visa. (Pls.' Facts ¶ 44; Exh. 127 (e-mail from ILMC to K. Clanton)

(reporting that certain workers "have not reported to the agent to get their paperwork taken care of" and requesting assistance in contacting them so they would not lose their interview slot at the U.S. Consulate).)

In addition to the cost of the passport and the visa processing fees, Candy Brand H-2A workers were also required to pay a mandatory visa application fee of $100 and visa "reciprocity" fee of $100, both paid at the Banamex bank.[3] (Pls.' Facts ¶¶ 48-49); 22 C.F.R. § 22.1(21)(a) (2002) (visa application fee). Defendants were aware of these fees, which are mandated by the U.S. government. (Exh. 122.) Each year between 2003 and 2007, all of Candy Brand's H-2A workers also had to pay the cost of bus transportation from their hometowns in Mexico to the U.S. Consulate in Monterrey for the visa interview. (Pls.' Facts ¶ 51.) Between 2003 and 2006, H-2A workers also had to pay the cost of transportation from Monterrey, Mexico to Hermitage, Arkansas to begin work for Defendants.[4] (Pls.' Facts ¶ 52.) Finally, for each year between 2003 and 2007, H-2A workers also were required to pay a $6 government-mandated fee to cross the U.S.-Mexico land border en route to Defendants' tomato operations in Arkansas. (Pls.' Facts ¶ 50.)

---

[3] Beginning in 2010, the U.S. Department of State eliminated the reciprocity fee for visa applicants from Mexico. It is undisputed that from 2003 through 2007, all of Defendants' H-2A workers were required to pay this fee to be eligible to receive an H-2A visa.

[4] In 2007, Candy Brand paid for and provided a bus for H-2A workers to travel from Monterrey, Mexico to Hermitage, Arkansas. (Pls.' Facts ¶ 53.) Even in that year, however, H-2A workers still paid the cost of travel from their hometowns in Mexico to Monterrey.

Defendants did not reimburse H-2A workers for the costs of passports, visa processing, visa, transportation, or border crossing expenses during their first workweek (Pls.' Facts ¶ 55.)  When H-2A workers arrived to begin work at Defendants' operations, they had already made a <u>minimum</u> of $481 in required (and undisputed) expenditures for passports ($30), visas ($200), visa processing ($145),[5] transportation (over $100), and border crossing fees ($6).  (Pls' Facts ¶¶ 43, 46-52; Exhs. 20, 122, 162-165.)  By the end of their first workweek, H-2A workers remained in a substantial financial hole due to Defendants' failure and refusal to reimburse these expenses.  For the reasons explained below, because these expenses were primarily for the benefit and convenience of the employer, Defendants' policy and practice of not reimbursing H-2A workers for these expenses during their first workweek at Candy Brand resulted in a violation of both the FLSA and the H-2A contract.

In addition to the above, once the Plaintiffs, opt-in Plaintiffs, and class members began working, the Defendants did not pay them any overtime wages when they worked in the packing sheds and worked more than 40 hours in a workweek.  (Pls.' Facts ¶¶ 78-79.)  Defendants have taken the position that the packing shed workers are exempt from overtime pay because they are employed in

---

[5]   In one year, 2003, the Defendants' H-2A workers only paid $50 for visa processing.  In each year between 2004 and 2007 they were required to pay $145 for visa processing.

"agriculture." Plaintiffs allege that the Defendants are unable to prove entitlement to the agricultural exemption because they processed tomatoes at their packing sheds that were grown by other farmers, including Dale McGinnis, Lowy Farms, Inc., A-W Produce, Inc., and others.

Finally, when H-2A workers completed the 50% period of their contract period, the Defendants provided them a $100 travel reimbursement, and no payment for daily subsistence. (Pls.' Facts ¶¶ 78-79.) The H-2A class members claim their travel expenses exceeded $100, and that they should have received their subsistence payments. (Pls.' Facts ¶¶ 9, 10, 170, 171.) The class members also claim that, at the end of the contract period, the Defendants did not pay or provide them with proper return transportation to their home towns in Mexico, and again did not pay them any daily subsistence payments. (Pls.' Facts ¶¶ 175-176.)

## IV.   DEFENDANTS VIOLATED THE FLSA AND THE H-2A CONTRACT BY FAILING TO REIMBURSE THE PLAINTIFFS', OPT-IN PLAINTIFFS', AND CLASS MEMBERS' PASSPORT, VISA PROCESSING, VISA, TRANSPORTATION, AND BORDER CROSSING EXPENSES DURING THEIR FIRST WORKWEEK.

Plaintiffs contend that Defendants violated both the FLSA and the H-2A contract by failing to properly reimburse Plaintiffs' passport, visa processing, visa, transportation, and border crossing expenses during the first workweek of each season, thus reducing their first weeks' earnings below the FLSA minimum wage

and the applicable Adverse Effect Wage Rate (AEWR).[6]  Defendants' refusal to reimburse these expenses violated not only the minimum wage guarantee of the FLSA, 29 U.S.C. § 206, but also violated the terms and conditions of the H-2A contract, which mandates payment of the AEWR for each hour worked and requires employers to comply with applicable federal, State, and local employment related laws and regulations.  See 20 C.F.R. § 655.103(b) (1987); 20 C.F.R. §§ 655.102(b)(9)(i) and (ii) (1987); § 655.101 (b)(1) and (2) (1987).

For the reasons explained more fully herein, Plaintiffs' passport, visa processing, visa, transportation, and border crossing expenses are primarily for the benefit or convenience of their employer and therefore must be reimbursed to the extent the costs of those items resulted in earnings of less than the minimum wage or the AEWR in the Plaintiffs' first workweeks.  Federal regulations and substantial caselaw clearly establish the Plaintiffs', opt-in Plaintiffs', and Rule 23 class members' rights to be reimbursed for the expenses they incurred to travel to the United States to work for Defendants.  29 C.F.R. §§ 531.29-35; Arriaga v. Florida Pacific Farms, L.L.C., 305 F.3d 1228, 1237 (11th Cir. 2002) (H-2A guestworkers); Morante-Navarro v. T & Y Pine Straw, Inc., 350 F.3d 1163, 1166 n.2 (11th Cir. 2003) (H-2B guestworkers); De Leon-Granados v. Eller & Sons

---

[6]  Because there remain disputed material issues of fact regarding Plaintiffs' claims for unreimbursed costs related to fees that Plaintiffs and other H-2A workers were charged to get their name on a list of prospective Candy Brand employees, Plaintiffs do not seek summary judgment on those claims.

Trees, Inc., 581 F. Supp. 2d 1295, 1320 (N.D. Ga. 2008) (H-2B guestworkers);

Rivera v. Brickman Group, Ltd., Civ. No. 05-1518, 2008 U.S. Dist. LEXIS 1167,

at * 50 (E.D. Pa. Jan. 7, 2008) (H-2B guestworkers); Martinez-Bautista v. D & S

Produce, 447 F. Supp. 2d 954, 963-964 (E.D. Ark. 2006) (H-2A guestworkers);

Avila-Gonzalez v. Barajas, No. 2:04-cv-567, 2006 U.S. Dist. LEXIS 9727, at *6-

*11 (M.D. Fla. March 2, 2006) (H-2A guestworkers); Recinos-Recinos v. Express

Forestry, Inc., No. 05-1355 I(3), 2006 U.S. Dist. Lexis 2510, at *44-*45 (E.D. La.

Jan. 27, 2006) (H-2B guestworkers); De Luna-Guerrero v. North Carolina

Grower's Ass'n, 338 F. Supp. 2d 649, 662 (E.D.N.C. 2004) (H-2A guestworkers);

Brock v. Glassboro Services Association, Inc., 107 Lab. Cases ¶ 34,961, 1987

WL25334 (D.N.J. 1987), aff'd 841 F.2d 1119 (3rd Cir.), cert. denied, 448 U.S. 821

(1988) (domestic migrant workers).  Because there are no substantial issues of

material fact regarding Plaintiffs' claims for unreimbursed expenses, partial

summary judgment should be granted in favor of Plaintiffs and opt-in Plaintiffs

pursuant to the FLSA, and in favor of the Plaintiffs and Rule 23 class members

pursuant to the breach of contract claim.

     A.    <u>The FLSA Entitles the Plaintiffs and Opt-in Plaintiffs to
Reimbursement for Expenses They Incurred Primarily for the
Benefit or Convenience of Their Employer to the Extent that Such
Expenses Reduced Their Earnings Below Minimum Wage.</u>

The FLSA is a remedial statute designed to "eliminate . . . substandard labor

conditions" in the United States.  Powell v. United States Cartridge Co., 339 U.S. 497, 510 (1950).  It was enacted to protect workers who lack sufficient bargaining power to secure a subsistence wage.  See Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739-40 (1981); Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 708 (1945).  The FLSA requires that employers must pay employees no less than the hourly minimum wage, which was $5.15 per hour for the majority of the relevant period.  29 U.S.C. § 206(a).[7]  The minimum wage must be received "free and clear" of improper deductions.  29 C.F.R. § 531.35.  Under the definition of wages in 29 U.S.C. § 203(m), an employer may regard as wages the reasonable cost of providing "board, lodging, or other facilities" and may count them toward satisfying its minimum wage obligations.  29 U.S.C. § 203(m).  Thus, in certain limited circumstances, an employer who provides meals or housing for workers may be credited for the reasonable cost of those "facilities" when compliance with minimum wage requirements is assessed.  29 C.F.R. § 531.32(a).  While the FLSA does not itself define "other facilities," under the USDOL regulations promulgated to clarify this provision, an employer may claim a wage credit for "other facilities" only when they are "something like board or lodging."  29 C.F.R. § 531.32(a). Items such as meals at company restaurants, housing, fuel, and general

---

[7] The federal minimum wage rose to $5.85 per hour on July 24, 2007.  However, all Plaintiffs, opt-in Plaintiffs, and Rule 23 class members had completed their first workweek of employment prior to the minimum wage increase.

merchandise at company stores are all examples of "other facilities" under section

203(m).  Id.  See also Davis Brothers, Inc. v. Donovan, 700 F.2d 1368, 1372 (11th

Cir. 1983) (employer who furnished meals to workers entitled to wage credit for

cost of meals).

However, facilities that are primarily for the benefit or convenience of the

employer are never "other facilities" within the meaning of 29 U.S.C. § 203(m)

and thus may never be treated as wages.  29 C.F.R. § 531.32(c).  Hence, an

employer may not deduct from employee wages costs incurred primarily for the

employer's benefit if the deductions drive wages below the minimum wage.

Arriaga, 305 F.3d at 1236;  see also Shultz v. Hinojosa, 432 F.2d 259, 266-67 (5th

Cir. 1970) (employer who furnished butchers with knives could not deduct the cost

of knives from minimum wages); Donovan v. Harper, No. 81-1049, 1984 U.S.

Dist. LEXIS 20145, at *6-*7 (W.D. La. Jan. 24, 1984) (no FLSA wage credits for

farmworkers' transportation to the fields); Torreblanca v. Naas Foods, No. F-78-

163, 1980 U.S. Dist. LEXIS 13893, at *13-*14 (N.D. Ind. Feb. 25, 1980)

(deductions for non-commuter transportation of migrant workers violates FLSA).

An employer may not shift the costs incurred primarily for its own benefit to an

employee:  there is no legal difference between directly deducting such a cost from

an employee's paycheck and requiring the employee to pay it himself.  Arriaga,

305 F.3d at 1236 (citing 29 C.F.R. §§ 531.35 and 531.36(b)); Root's Restaurant,

667 F.2d at 560.  Hence an employer cannot escape its minimum wage obligations by requiring employees to pay directly for costs that it would be prohibited from deducting from their pay.  Arriaga, 305 F.3d at 1236.

In Arriaga, the Eleventh Circuit addressed a case virtually identical to this case—the question of whether an employer must reimburse foreign H-2A guestworkers' visa and travel costs under the FLSA.  The court ruled that the costs of H-2A guestworkers' visas and travel from their home country to the United States were incurred "for the primary benefit and convenience of their employer" and thus not "other facilities" that could be counted as a wage credit pursuant to 29 U.S.C. § 203(m).  Arriaga, 305 F. 3d at 1242.  In ruling that workers' international travel and guestworker visas were not "other facilities" like board and lodging, the Eleventh Circuit emphasized that employees' travel and visa costs were "an inevitable and inescapable consequence" of the employer's hiring foreign guestworkers.  Id.  Hence, because these were costs inherent in the employer's choice of employees, they were an "incident of and necessary to the employment," 29 C.F.R. § 531.32(a), and thus the FLSA obligated employers to reimburse them if failure to do so would drop the employee's wages below the minimum wage. Arriaga, 305 F. 3d at 1242.

The court also recognized that a clear line exists between costs that arise in the course of ordinary life (such as room and board) and costs that arise

specifically from the employment itself (such as tools and uniforms), and that this distinction determines whether a cost qualifies as "incident of and necessary to the employment." Arriaga, 305 F.3d at 1242-43; see also 29 C.F.R. §§ 531.3(d)(2) and 531.32(c) (identifying several items as costs that primarily benefit the employer, including "transportation charges where such transportation is an incident of and necessary to the employment"); Shultz, 432 F.2d at 267. Employees' travel and visa costs were not expenses they would have incurred normally in the course of life, but rather, like uniforms and tools, were costs necessitated by the job itself. Arriaga, 305 F.3d at 1243-44. Furthermore, because these expenses, which primarily benefited the employer, arose pre-employment, the Eleventh Circuit ordered the employers to reimburse each guestworker during his first workweek. Id. at 1237 (citing Root's Restaurant, 667 F.2d at 560).

Significantly, the Eleventh Circuit did not rely on the H-2A regulations in deciding Arriaga. Although those regulations do require reimbursement of travel expenses, see 20 C.F.R. §§ 655.102(b)(5)(i) (1987), this obligation arises at the midpoint of the contract, and the court specifically held that the FLSA required reimbursement in an employee's first workweek, regardless of the effect of the H-2A regulations. Arriaga, 305 F.3d at 1235-36 ("[W]hen employment statutes overlap, we are to apply the higher requirement unless the regulations are mutually exclusive.") (citations omitted); see also De Luna-Guerrero v. North Carolina

19

Grower's Association, 338 F. Supp. 2d 649, 663-64 (E.D.N.C. 2004) (finding no conflict between the requirement under the H-2A regulations of full reimbursement of inbound transportation and subsistence costs at the 50% point of the contract, and the earlier obligation under the FLSA to reimburse visa and transportation costs up to the level of the minimum wage during the first workweek).  Courts following Arriaga have also noted its holding is not based on the H-2A regulations, but rather is based on the FLSA.  See, e.g., Morante-Navarro v. T&Y Pine Straw, Inc., 350 F.3d 1163, 1166 n.2 (11th Cir. 2003) (stating that visa and travel costs "cannot lawfully be credited against the employer's minimum wage obligations" to H-2B workers); Rivera v. Brickman Group, Ltd., Civ. No. 05-1518, 2008 U.S. Dist. LEXIS 1167, at * 50 (E.D. Pa. Jan. 7, 2008) (finding employer liable under the FLSA for costs of H-2B guestworkers' visas, transportation, and recruitment fees); DeLeon-Granados v. Eller and Sons Trees, Inc., 581 F. Supp. 2d 1295, 1312 (N.D. Ga. 2008) (holding that H-2B guestworkers' passport, visa and travel costs were primarily for the benefit of the employer).  Indeed, the Arriaga decision is consistent with earlier cases holding that non-commuter long-distance travel expenses are for the benefit of the employer and thus cannot be charged to employees.  See, e.g., Donovan v. Harper, No. 81-1049, 1984 U.S. Dist. LEXIS 20145, at *6-*7 (W.D. La. Jan. 24, 1984); Torreblanca v. Naas Foods, Inc., No. F 78-163, 1980 U.S. Dist. LEXIS 13893 (N.D. Ind. Feb. 25, 1980); Brock v.

20

Glassboro Service Association, Inc., 107 Lab. Cas. (CCH) P34,961, 1987 WL

25334 at *6 (D.N.J. July 23, 1987) (finding that costs of workers' travel from

Puerto Rico to New Jersey – as a result of employer's affirmative recruitment

efforts—were a cost for the benefit of the employer); Marshall v. Glassboro

Service Association, 87 Lab. Cas. (CCH) P33865, 1979 U.S. Dist. LEXIS 9053, at

*6 (D.N.J. Oct. 19, 1979).  The USDOL recently reaffirmed that under the FLSA,

employers are obligated to reimburse travel and immigration-related costs to

temporary foreign guestworkers if the costs reduce the workers' wages below the

federal minimum wage during the first workweek.[8]  See Field Assistance Bulletin

No. 2009-2 (Aug. 21, 2009) (attached as Exh. 334).  Thus it is well-established that

expenses of the type incurred by the Plaintiffs, opt-in Plaintiffs, and class members

in this case are for the benefit of the employer and must be reimbursed to the

extent they reduced workers' wages below the FLSA minimum wage in the week

after they were incurred, i.e., the first workweek.

   B.   The Passport, Visa Processing, Visa, Transportation, and Border
        Crossing Expenses Incurred by the Plaintiffs and Opt-in Plaintiffs
        Were Primarily for the Benefit of Defendants.

   The Court should adopt the sound reasoning of the Eleventh Circuit in

Arriaga and find that the failure to reimburse H-2A workers the costs they incurred

---

[8] Although this Field Assistance Memorandum addressed employer obligations to reimburse these costs under the H-2B program, the DOL Wage and Hour Division noted the similarities between the two nonimmigrant visa programs and, citing Arriaga, emphasized that its analysis is "relevant by analogy."

to work for Defendants in Arkansas resulted in a violation of the FLSA.  Plaintiffs and opt-in Plaintiffs seeking partial summary judgment on the FLSA claims faced the same situation as the H-2A workers in <u>Arriaga</u>, who necessarily incurred a number of expenses to work for their U.S.-based employer on a temporary basis. The passport, visa processing, visa, transportation, and border crossing expenses that workers bore as a condition of their employment with Defendants were not costs that would have otherwise arisen in the ordinary course of life.  <u>See Arriaga</u>, 305 F.3d at 1243-44.

Specific facts from this case make clear that the costs the H-2A workers incurred were primarily for the benefit of Defendants, whose business depended on the workers arriving from Mexico at a designated time, with visas approved, and ready to begin work in Defendants' tomato operations.  Use of the H-2A program was fundamental to Defendants' business operations.  First and foremost, Candy Brand would have been unable to fill its labor needs without the H-2A workers, due to a dearth of available workers in the surrounding areas.  (Pls.' Facts ¶¶ 21-26; Exh. 101 (communication from ILMC to the USDOL on 2/3/04 explaining recruitment efforts and stating they had received no job applicant referrals for positions at Candy Brand); Exh. 105 (same, 12/28/04); Exh. 108 (same, 4/21/05); Exh. 112 (same, 2/3/06); Exh. 116 (same, 4/21/06); Exh. 121 (same, 4/1/07).) Given the significant amount of work required to prepare, care for, and harvest the

tomato crop, coupled with the insufficient number of local workers available,

Defendant Randy Clanton recognized that "you would need the H-2A deal to make

that work." (Pls.' Facts ¶ 25.) Furthermore, Defendants were keenly aware of the

importance of the H-2A program in meeting their labor needs. In 2006, their

agent, ILMC, sent letters on behalf of Candy Brand to the U.S. Senators from

Arkansas, imploring them to intervene with the Consulate in Monterrey to

facilitate the processing of Candy Brand H-2A visas because "[a]n agricultural

disaster is imminent for Mr. Clanton if he does not get his workers. He is totally

dependent on the H-2A program and the federal bureaucracy to get his workers to

his farm on time." (Pls.' Facts ¶ 29; Exh. 172.) That Arkansas tomato growers

had only about six to eight weeks during the summer months in which to harvest

and pack the vast majority of the crop underscores the critical importance of the

availability of the temporary H-2A workforce to Defendants' business model.

(Pls.' Facts ¶ 27-28.) As ILMC noted in another communication, "There is a short

window at Candy Brand to get all of their tomatoes harvested, a one-week delay

could be devastating." (Pls.' Facts ¶ 29; Exh. 168.) Any delay in harvesting the

tomatoes could result in the crop rotting in the fields, and the months of

preparation and capital expenditure could be lost if there were not enough workers

available to pick tomatoes at the precise moment they were ripe. (Pls.' Facts ¶¶

27-29.) Apart from the obvious benefits to Defendants in securing a stable, large,

and timely workforce to harvest its crops, the H-2A program provided a further boon because they were not required to pay the 7.65% Social Security and Medicare employer match on H-2A workers' wages. (Pls.' Facts ¶¶ 57-58). Between 2003 and 2007, Candy Brand often had an H-2A payroll of over $1 million, resulting in Social Security and Medicare tax savings of over $76,500 per year due to its employment of H-2A workers. (Pls.' Facts ¶ 59.)

Defendants made a business decision to seek out and hire a temporary workforce from abroad, with an understanding that workers would have to obtain necessary documents and travel long distances to begin work. By definition, a non-citizen admitted under the H-2A program must maintain his or her residence in a foreign country and as such, cannot come from a commutable distance to work for the U.S. employer. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). With full knowledge of these conditions, Defendants chose to employ approximately 1,800 H-2A workers between 2003 and 2007, after certifying to the U.S. government that they were unable to find sufficient U.S. workers able, willing and qualified to perform the work.

The record makes clear that in addition to their acknowledgment of the importance of the H-2A workforce to the operation of their business, Defendants had both actual and constructive knowledge of the numerous costs that H-2A workers bore on their way to, and as a consequence of, employment with

Defendants.  First, it was abundantly obvious to Defendants that the H-2A workers they employed from Mexico had to travel great distances to arrive in Hermitage to begin work.  As of 2003, they were on notice of the precise cost to workers of traveling from Monterrey, Mexico to Hermitage, Arkansas.  (Pls.' Facts ¶ 9.) Defendants also received multiple notices from ILMC with regard to their obligation to reimburse inbound transportation costs, which included approximate costs of bus travel from various parts of Mexico to the U.S. border and from the border to the workers' destination in the United States.  (Pls.' Facts ¶ 174; Exhs. 20, 162, 163-165.)  Yet despite their awareness that H-2A workers incurred significant travel expenses to arrive in Arkansas and begin work, Defendants simply did not reimburse this expense during the first workweek, resulting in the FLSA violation.

Furthermore, Defendants knew there were costs associated with the visa itself and with obtaining the assistance of an agent to process the visa, and knew precisely what these costs were.  Because Candy Brand requested such a large number of H-2A workers, the services of Solstice International, MOA, and CSI were essential in ensuring that the H-2A visa process ran smoothly and Candy Brand's workforce would arrive on time in the United States.  (Pls.' Facts ¶¶ 8, 38.)  None of the Defendants or any officers of Candy Brand, LLC, or Arkansas Tomato Shippers, LLC, maintained a physical presence in Mexico such that they

25

could assist potential H-2A workers with their visa applications or interviews at the

U.S. Consulate in Monterrey.  Defendants hired a large number of H-2A workers

each year and insisted that they arrive at designated times, given the urgent need to

harvest and pack the tomatoes within a strictly limited time period.  (Exh. 142 (e-

mail from K. Clanton to ILMC) ("If we can't cross [particular H-2A workers] next

week, there is no use in trying to bring them.").)  As a result, the Defendants

necessarily relied on other individuals in Mexico to ensure that workers'

processing through the consulate proceeded as smoothly as possible so that

Defendants' workforce arrived in time to harvest the tomato crop.  (Pls.' Facts ¶¶

8, 38).  Just as the Defendants hired AgWorks and ILMC to process their

applications to the U.S. government for H-2A workers, so too were the Defendants

aware that H-2A applicants were required to contact and pay fees to MOA or CSI

agents to process H-2A visas in Mexico.  (Pls.' Facts ¶¶ 6, 43; Exh. 21 (e-mail

from K. Clanton to ILMC) ("Some of the first contract workers went to Lisa

Losano (agent in Morelia, MX) to pay and complete their paperwork and were told

they were not on the list."); Exh. 152 (e-mail from ILMC to K. Clanton) ("We

need you or someone from Candy Brand to catch these folks up on the process.

The workers need to be turning in their passports and money as they are

contacted.").)

26

Defendants were acutely aware of the importance of getting their H-2A workers processed through the MOA or CSI agents in Mexico in a timely fashion, as evidenced by the multiple communications that Kristi Clanton exchanged with ILMC regarding specific workers and the timing of their appointments with MOA or CSI agents and the U.S. Consulate.  (Exh. 28 (e-mail from K. Clanton to ILMC) ("[L]et me know as soon as the names are entered on the agent's lists so I can tell our people here to send them to the agent."); Exh. 140 (e-mail from K. Clanton to ILMC) ("[T]he new workers we added as replacements for shed 2 have went [sic] to the agent in Hidalgo and were not on the list.. I told them to go back in 2 days..please contact MOA/agent and make sure these are on the list."); Exh. 147 (e-mail from K. Clanton to ILMC) ("Where are we on the April crossing—has the appointment been confirmed?  [H]ow many of the workers have signed up and/or paid at this time?").)  While Defendants paid AgWorks and ILMC for their assistance with government paperwork on the U.S. side, in the case of the agents operating in Mexico, Defendants simply passed these costs on to the H-2A workers rather than paying them upfront or reimbursing the workers for these expenses.  (Pls.' Facts ¶ 40.)  The purpose and effect of the work of AgWorks and ILMC in the United States and Solstice International, MOA, and CSI in Mexico, however, were the same—to secure an H-2A workforce for Defendants at the time and place they needed it.  A Candy Brand H-2A worker had no choice but to use these agents

and pay the fees they charged.  (Pls.' Facts ¶ 44.)  The costs associated with

obtaining the H-2A visa, therefore, were for the primary benefit of the Defendants

to the extent that these costs reduced the H-2A workers' earnings below the

minimum wage during the first workweek, a FLSA violation occurred.

      Moreover, the passport, visa processing, visa, transportation, and border

crossing expenses were not expenses like board and lodging, which Plaintiffs

would have incurred in the ordinary course of life.  See 29 C.F.R. § 531.32(a).

Plaintiffs were required to obtain passports as a necessary first step to participating

in the H-2A program.  As an H-2A worker is by definition a non-citizen admitted

temporarily to the United States, he or she is required to have a valid passport to

enter the United States.  8 U.S.C. § 1182(a)(7)(B)(i).  Plaintiffs simply did not have

passports before they sought work with Defendants.  (Pls.' Facts ¶ 46.)  Similarly,

the opt-in Plaintiffs obtained H-2A visas and paid travel costs precisely to work for

Defendants.  Unlike food or lodging, Plaintiffs would not have otherwise incurred

the expense of bus tickets to Arkansas or visa application and processing fees—

costs specifically necessitated by their employment with Defendants—in the

course of their lives.  The bus tickets would have been of no use to Plaintiffs

outside their employment with Defendants, because without their H-2A visas

secured by Candy Brand, they would have been unable to enter the United States

legally.  8 U.S.C. § 1182(a)(7)(B)(i).  Similarly, the H-2A visa had no independent

value to Plaintiffs separate from their employment with Defendants, because the terms of the H-2A visa permitted Plaintiffs to work only for Candy Brand.  See 8 C.F.R. § 214.2(h)(2)(i)(D).  Finally, the land border crossing fee $6 was an additional, required expense that Plaintiffs paid as a requirement of their employment with Defendants.  This expense arose out of and related exclusively to the H-2A workers' employment at Candy Brand, and was primarily for the benefit of Defendants.  As such, it is more akin to chamber of commerce dues or tax and insurance costs, which primarily benefit the employer and therefore cannot count toward an employer's wage obligations under the FLSA.  29 C.F.R. § 531.32(c).

It is clear that Defendants did not reimburse Plaintiffs and opt-in Plaintiffs during their first workweeks for these expenses, as required by the FLSA.  (Pls.' Facts ¶ 55).  Defendants thus violated the FLSA when these de facto deductions dropped Plaintiffs' wages below the federal minimum during the first workweek. The undisputed facts in this case clearly show that the 97 FLSA claimants seeking partial summary judgment incurred passport, visa processing, visa, transportation, and border crossing expenses that were primarily for the benefit of the Defendants, and thus, like the H-2A workers in Arriaga, they must be reimbursed to the extent that these costs reduced the Plaintiffs' and opt-in Plaintiffs' wages below the minimum wage.

By way of illustration, when Plaintiff Rosalino Perez Benites arrived for work at Candy Brand in the 2005 season, he had already spent $542 in undisputed costs[9] to get there ($200 in government-mandated visa fees, $145 for visa processing, $161 for bus transportation, $30 for a passport and $6 in border-crossing fees).  (Pls.' Facts ¶¶ 42, 46-52; Exhs. 20, 122.)  Upon arrival in Hermitage, Arkansas, Mr. Perez Benites began work and earned $65.60 for 10 hours of work in his first workweek with Candy Brand.  (Exhs. 30, 333.)  To determine whether a particular individual was underpaid pursuant to the FLSA during their first workweek, one need only calculate the amount of expenses that were incurred and add that figure to the FLSA minimum wages due the individual based on the number of hours they worked in their first workweek.  If the amount of incurred expenses plus FLSA minimum wages earned in the first workweek is greater than the amount of gross wages the individual Plaintiff was paid for his or her first workweek, then a FLSA violation occurred.  In the case of Mr. Perez Benites, he should have been paid $542 for the undisputed expenses plus $51.50 based on 10 hours of work at the FLSA minimum wage of $5.15 per hour—a total of $593.50.  Thus, he should have been reimbursed $527.90 in that first workweek

---

[9] As noted above, there are additional costs that remain in dispute—in particular, the costs that H-2A workers have testified they paid to get their name on the "list" of individuals eligible to work at Candy Brand.  For the purpose of this motion, however, Plaintiffs and opt-in Plaintiffs seek partial summary judgment only as to the undisputed costs, which are passport fees, visa processing costs, visa fees, transportation costs, and the border crossing fee.  (Exh. 122.)

in order to bring his wages up to the minimum level required by the FLSA

($593.50-$65.60 = $527.90).  But because Defendants failed to reimburse H-2A

workers' costs for passports, visa processing, visas, transportation, and border-

crossing fees, Plaintiff Rosalino Perez Benites suffered a FLSA minimum wage

violation in his first workweek of $527.90.  In addition, as will be set forth below,

because the Defendants cannot show that their refusal to reimburse these expenses

was in good faith or objectively reasonable, Plaintiff Perez Benites and the other

Plaintiffs and opt-in Plaintiffs are entitled to an equal amount in liquidated

damages pursuant to the FLSA, 29 U.S.C. § 216(b).  Accordingly, for Plaintiff

Perez Benites' first workweek in June 2005, his total FLSA damages based on

unreimbursed expenses are $1,055.80.

Similarly, during the 2006 season, Plaintiff Perez Benites spent $597.67 in

undisputed costs to begin work at Candy Brand ($200 in government-mandated

visa fees, $145 for visa processing, $216.67 for bus transportation, $30 for a

passport and $6 in border-crossing fees).  (Pls.' Facts ¶¶ 42, 46-52; Exhs. 122,

165.)  He earned $30.32 for 4 hours of work during his first workweek.  (Exh.

332.)  Plaintiff Perez Benites should have been paid $597.67 for the undisputed

costs he incurred, as well as wages of $20.60, using the $5.15 minimum hourly

wage rate for the hours he worked, for a total of $618.27.  Given the amount Mr.

Perez Benites actually earned for the hours he worked that week ($30.32),

Defendants should have reimbursed him a total of $587.95 to bring his wages up to the minimum wages required by the FLSA ($597.67 - $30.32 = $587.95).  Because Defendants failed to reimburse these costs to Mr. Perez Benites, he suffered a FLSA minimum wage violation in the amount of $587.95, which with liquidated damages comes to a total of $1,175.90 in FLSA unreimbursed expenses damages for the first workweek.

      C.    <u>Defendants Breached the H-2A Contract by Failing to Reimburse the Plaintiffs' and Class Members' Passport, Visa Procssing, Visa, Transportation, and Border Crossing Expenses.</u>

In addition to violating the FLSA through their failure to reimburse the costs that Plaintiffs and opt-in Plaintiffs incurred to arrive in Arkansas to work at Candy Brand, Defendants also violated the terms of the H-2A contract applicable to the Class I members.  See <u>De-Leon Granados v. Eller & Sons Trees, Inc.</u>, 581 F. Supp. 2d 1295, 1317 (N.D. Ga. 2008) (finding a breach of the "statutory contract" under the Migrant Seasonal Agricultural Worker Protection Act for failure to reimburse H-2B workers' expenses); <u>Avila-Gonzalez v. Barajas</u>, No. 2:04-cv-567, 2006 U.S. Dist. LEXIS 9727, at *5-*6 (M.D. Fla. March 2, 2006) (failure to reimburse H-2A workers' expenses violated the employer's obligation to pay the AEWR).  As explained above, to participate in the H-2A program, Defendants filed forms ETA 750 (application) and 790 (clearance order) with the federal government, which together constitute the job offer and must comply with the applicable regulations.

20 C.F.R. § 655.101(b) (1987).  These regulations establish the minimum benefits,

wages, and working conditions that must be offered to employees, and essentially

form the employment contract between the employer and the individual H-2A

workers.  See Arriaga, 305 F.3d at 1233 n.5 ("clearance orders ultimately become

the work contract between the employers and the farmworkers"); Salazar-Calderon

v. Presidio Valley Farmers Ass'n, 765 F.2d 1334, 1341-42 (5th Cir. 1985);

Frederick County Fruit Growers Ass'n v. McLaughlin, 703 F. Supp. 1021, 1031

(D.D.C. 1989); Western Colorado Growers Ass'n v. Marshall, 473 F. Supp. 693,

696 (D. Colo. 1979) ("clearance order is essentially an offer for a contract of

employment").

Specifically, to ensure that the employment of H-2A workers did not

adversely affect the wages and working conditions of U.S. workers, 8 U.S.C. §

1188(a)(1), Defendants were obligated to pay the higher of the federal minimum

wage, the prevailing wage, or the Adverse Effect Wage Rate (AEWR) for each

hour worked.  20 C.F.R. § 655.102(b)(9) (1987).  The AEWR is the wage that the

USDOL determines employers must pay in cases when they seek to employ H-2A

workers to avoid a negative effect on the wages of similarly-employed U.S.

workers.  20 C.F.R. § 655.100(b) (1987).  Payment of the AEWR is thus a crucial

component of the statutory mandate to protect U.S. workers, who would otherwise

face unfair competition if an employer were permitted to bring in temporary

foreign workers, pay them a substandard wage, and undercut domestic workers'
earnings.  Because in this case the AEWR was the highest of the three wage rates
listed in the regulation, if Defendants failed to pay the AEWR for each hour
worked, they breached the H-2A contract.  In addition to the requirement that they
pay the AEWR, Defendants were contractually obligated to "comply with
applicable federal, State, and local employment related laws and regulations."  20
C.F.R. § 655.103(b) (1987); see also 20 C.F.R. §§ 655.101 (b)(1) and (2) (1987)
(noting that all job offers must comply with the requirements of 20 C.F.R. §
655.102 and must contain an agreement to abide by the assurances required by 20
C.F.R. § 655.103).  The Fair Labor Standards Act is clearly one such law that the
H-2A contract incorporates.  See De Luna Guerrero, 338 F. Supp. 2d at 663 ("[B]y
participating in the H2A program, the employer agrees to abide by and comply
with all applicable federal, state and local employment related laws and
regulations. . . .  These statutes include the FLSA.") (citation omitted).  As a result,
failure to pay the federal minimum wage, in addition to being a violation of the
FLSA, also constitutes a breach of the H-2A contract.

> 1.  The Named Plaintiffs and Class Members Are Entitled to Be
>     Reimbursed for Costs Incurred Primarily for the Benefit of
>     Defendants to the Extent that Those Costs Dropped Their Pay
>     Below the Adverse Effect Wage Rate.

The Defendants violated the H-2A contract by failing to reimburse workers

for the passport, visa processing, visa, transportation, and border crossing expenses

they incurred for Defendants' benefit.  See De-Leon Granados, 581 F. Supp. 2d at 1316 (class of H-2B workers entitled to reimbursement of passport, travel, and visa expenses up to the level of the applicable prevailing wage); Avila-Gonzalez, 2006 U.S. Dist. LEXIS 9727, at *5-*6 (class of H-2A workers entitled to reimbursement of travel, passport, recruitment, and visa costs up to the level of the AEWR). Where an employer is required by law to pay a wage higher than the federal minimum wage, it may not make deductions for its own benefit that reduce an employee's pay below that mandated wage rate—in this case, the AEWR.  See USDOL Wage and Hour Memorandum No. 99-03 (attached as Exh. 335).  Here, as noted above, Defendants were required to pay a wage rate higher than the federal minimum wage to avoid displacement of U.S. workers and as a condition of the USDOL's certification of their application for temporary foreign workers.  In addition, the H-2A class members in this case incurred significant costs that were primarily for the benefit or convenience of Defendants.  See Part IV.B., supra.  As explained above, the legal effect of requiring employees to bear these costs was the same as if Defendants deducted these expenses directly from employee's wages, Arriaga, 305 F.3d at 1236; DeLeon-Granados, 581 F. Supp. 2d at 1319 ("Because these costs had the same legal effect as a deduction from employees' wages . . ., Plaintiffs and the Rule 23(b)(3) class members did not receive the promised prevailing wage during their first workweeks of employment").  Plaintiffs and

class members were required to incur these expenses and were not properly reimbursed for them, meaning that they earned less than the Adverse Effect Wage during their first workweeks.

The Rule 23 class members, like the FLSA opt-in Plaintiffs described above, made the same significant expenditures in passport, visa processing, visa, transportation, and border crossing expenses for the sole purpose of working for Defendants. All H-2A workers whom the Defendants employed had to take the same steps to obtain a passport, process their visa applications, and travel from disparate locations in Mexico to Arkansas to begin work with Defendants. While their costs varied somewhat depending on the area of Mexico from which they traveled, it is undisputed that the passport, visa processing, visa, and border crossing expenses were identical for all H-2A class members. Given that Defendants' policy and practice of not reimbursing these costs caused a minimum wage violation under the FLSA, it also necessarily resulted in a failure to pay the higher Adverse Effect Wage rate, and accordingly, a violation of the H-2A contract. See DeLeon-Granados, 581 F. Supp. 2d at 1319; Avila-Gonzalez, 2006 U.S. Dist. LEXIS at *6 ("[T]he applicable wage rate is the adverse effect wage rate; to the extent that the workers' net earnings in the first week of work fell below this rate because of the pre-employment expenditures . . ., [Defendants] were required to reimburse these amounts to the workers."). Allowing Defendants

to, in effect, circumvent their higher wage obligations under the H-2A contract would nullify the protections of the H-2A program that seek to avoid adversely affecting U.S. workers.  Because the USDOL has determined that the minimum wage guarantee of the FLSA may sometimes be insufficient to protect U.S. workers, where an employer must pay a higher wage to comply with its obligations under the H-2A program, it should not be permitted to effectively deduct from the required wage rate by passing along to its employees costs that are primarily for the employer's benefit.

Taking the example of Plaintiff Rosalino Perez Benites above, in the 2005 season, he spent $542 in undisputed costs to arrive at Candy Brand to begin work ($200 in government-mandated visa fees, $145 for visa processing, $161 for bus transportation, $30 for a passport and $6 in border-crossing fees) and earned $65.60 for 10 hours of work in his first workweek.  (Pls.' Facts ¶¶ 42, 46-52; Exhs. 20, 30, 122, 333.)  Pursuant to the AEWR in effect during 2005, he should have earned $78.00 for ten hours of work, which when added to the $542 owed him in costs, comes to a total $620.00.  He should have been reimbursed $554.40 during the first workweek to bring his wages up to the AEWR level required by the contract ($620.00 - $65.60 = $554.40).  But because Defendants failed to reimburse Plaintiff Perez Benites' required expenditures, they breached the H-2A contract with him in the amount of $554.40.  Similarly, during the 2006 season,

Plaintiff Perez Benites spent $597.67 in undisputed costs ($200 in government-mandated visa fees, $145 for visa processing, $216.67 for bus transportation, $30 for a passport and $6 in border-crossing fees), and earned $30.32 for 4 hours of work during his first workweek.  (Pls.' Facts ¶¶ 42, 46-52; Exh. 122, 165, 332.) Plaintiff Perez Benites should have been paid $597.67 for the undisputed costs he incurred, as well as wages of $30.32, using the $7.58 AEWR for 2006, for a total of $627.99.  Given the amount Mr. Perez Benites actually earned for the hours he worked that week ($30.32), Defendants should have reimbursed him a total of $597.67 to bring his wages up to the minimum wages required by the AEWR ($627.99 - $30.32 = $597.67).  As a result, Defendants breached the H-2A contract with Mr. Perez Benites—and all members of Class I, who incurred the same expenses—by failing to reimburse these expenses to the AEWR level required by the contract.

        2.     <u>The Plaintiffs and Class Members Are, at a Minimum, Entitled to Be Reimbursed Up to the Level of Minimum Wage for Expenses Primarily Benefitting the Employer.</u>

Even if the Court holds that the Plaintiffs and Rule 23 class members are not entitled to reimbursement of the expenses incurred for Defendants' benefit up to the level of the applicable Adverse Effect Wage Rate, it is indisputable that the H-2A contract incorporates the minimum wage requirements of the FLSA.  20 C.F.R. § 655.103(b) (1987) ("During the period for which the temporary alien agricultural

labor certification is granted, the employer shall comply with applicable federal, State, and local employment-related laws and regulations . . .").  Accordingly, the Plaintiffs and class members are at a bare minimum entitled to reimbursement of their expenses up to the level of the FLSA minimum hourly wage.  A violation of the FLSA minimum wage provisions also breaches the terms of the H-2A contract because Defendants, through their clearance orders, explicitly agreed to comply with applicable federal employment laws, including the FLSA.  See Avery v. Talladega, 24 F.3d 1337, 1348 (11th Cir. 1994) ("If a violation of the FLSA has occurred, then a violation of the contract, which incorporates the FLSA, will have occurred as well.").  As a result, if Defendants are liable to the Plaintiffs and opt-in Plaintiffs for violations of the FLSA, they also breached the terms of the contract with Class I members, who as H-2A workers all paid the same required expenses to begin working at Candy Brand.

As described in Section IV.B., supra, the passport, visa processing, visa, transportation, and border crossing expenses incurred by the Plaintiffs and class members were for the benefit of Defendants, and thus, to the extent the costs drove the H-2A workers' wages below $5.15 an hour in the first workweek, Defendants must reimburse them.  The undisputed facts show that all of Defendants' H-2A workers incurred these costs, and that the Defendants did not reimburse them during the first workweek.  (Pls. Facts ¶¶ 45-52, 55.)  As a matter of law, this

failure to comply with the FLSA constitutes a breach of the H-2A contract and the Plaintiffs and Rule 23 class members are entitled to summary judgment.

There is no issue of material fact regarding the expenses incurred by the Plaintiffs, opt-in Plaintiffs, and Rule 23 class members; nor is there any question that Defendants failed to reimburse these expenses during the H-2A workers' first workweeks. The only question before the Court is one of law; namely, whether Defendants must reimburse expenses their H-2A employees incurred primarily for the benefit and convenience of the Defendants to the extent those expenses dropped wages below the applicable minimum wage and Adverse Effect Wage rates. Defendants' decision to utilize temporary foreign workers to fulfill their labor needs, which was clearly essential to the survival of their business, brought with it a number of attendant costs that Defendants cannot lawfully pass on to their indigent employees. Substantial caselaw, as well as well-established federal regulations, make clear that these expenses must be reimbursed to employees. The Plaintiffs, opt-in Plaintiffs, and Rule 23 class members are therefore entitled to summary judgment on their claims for unreimbursed expenses pursuant to the FLSA and the H-2A contract.

**V.    THE DEFENDANTS VIOLATED THE FLSA AND THE H-2A EMPLOYMENT CONTRACT BY FAILING TO PAY PACKING SHED WORKERS OVERTIME PAY.**

The named Plaintiffs and FLSA opt-in Plaintiffs who were employed in the Defendants' packing shed operations move for summary judgment on their right to receive overtime wages pursuant to the FLSA.  Likewise, because their employment contracts required the Defendants to comply with all federal, state, and local laws—which includes the FLSA—the Class II members who, by definition, were employed in the Defendants' packing shed operations, move for summary judgment on their right to receive overtime wages.  See Avery v. City of Talladega, 24 F.3d 1337, 1348 (11th Cir. 1994) ("If a violation of the FLSA has occurred, then a violation of the contract, which incorporates the FLSA, will have occurred as well."); De Luna-Guerrero v. North Carolina Grower's Ass'n, 338 F. Supp. 2d 649, 663 (E.D.N.C. 2004) ("[B]y participating in the H2A program, the employer agrees to abide by and comply with all applicable federal, state and local employment related laws and regulations. . . . These statutes include the FLSA.") (citation omitted).

Pursuant to the FLSA, employees who work more than forty (40) hours in a workweek are entitled to receive overtime pay, absent an applicable exemption.  29 U.S.C. § 207(a).  Defendants in this case mistakenly claim they were not required to pay overtime wages because their packing shed workers were engaged in

"agricultural" work exempt from FLSA overtime requirements.  29 U.S.C. §

213(b)(12).  It is Defendants' burden to show they are entitled to the exemption.

Mitchell v. Kentucky Finance Co., 359 U.S. 290, 291 (1959); 29 C.F.R. § 780.2.

Because the FLSA is a humanitarian statute, its exemptions are to be narrowly

construed.  A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945).  As the

Supreme Court stated in A.H. Phillips: "Any exemption from such humanitarian

and remedial legislation must therefore be narrowly construed . . . .  To extend an

exemption to other than those plainly and unmistakably within its terms and spirit

is to abuse the interpretive process and to frustrate the announced will of the

people."  See also 29 C.F.R. § 780.2.  Because the Defendants cannot meet their

burden of proving they are "plainly and unmistakably" entitled to the agricultural

exemption with respect to their packing shed workers, summary judgment for the

Plaintiffs, FLSA opt-in Plaintiffs, and Class II members is appropriate.

　　　　The definition of what constitutes "agriculture" within the meaning of the

FLSA is found in section 3(f) of the Act, which states:

> 'Agriculture' includes farming in all its branches and among other things
> includes the cultivation and tillage of the soil, dairying, the production,
> cultivation, growing, and harvesting of any agricultural or horticultural
> commodities . . . , the raising of livestock, bees, fur-bearing animals, or
> poultry, and any practices (including any forestry or lumbering operations)
> performed by a farmer or on a farm as incident to or in conjunction with
> such farming operations, including preparation for market, delivery to
> storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f).  The definition has often been described to refer to "primary agriculture" and "secondary agriculture."  Marshall v. Gulf & Western Industries, Inc., 552 F.2d 124, 126 (5th Cir. 1977).  "Primary agriculture" includes farming in all its branches, such as cultivation and tillage of the soil, dairying, production, cultivation, growing, and harvesting.  Farmers Reservior & Irrigation Co. v. McComb, 337 U.S. 755, 762 (1949).  "Secondary agriculture" refers to that part of the definition related to any practices performed by a farmer or on a farm as incident to or in conjunction with "such" farming operations.  Id. at 762-763.  There is no dispute in this case that packing shed work does not fall within the primary definition of agriculture.  Likewise, there is no dispute that the packing shed work was not performed "on a farm," as Defendants' packing shed operation was not located on or adjacent to any tomato fields.  (Pls.' Facts ¶ 80) (noting that the closest fields were approximately a 10-15 minute drive from the packing shed facility).)[10]  Rather, the crux of the parties' disagreement is whether the work performed by the Defendants' packing shed workers was performed by a farmer or was performed by a farmer as an incident to that farmer's farming operations.  Put another way, the questions are (1) whether Candy Brand was a "farmer" and (2) if

---

[10] It is also undisputed that the Defendants' packing shed workers often worked more than 40 hours per workweek and that the packing shed workers were never paid overtime wages.  (Pls.' Facts ¶¶ 78, 79.)

Candy Brand was a "farmer," whether the packing shed work was performed as an incident to Candy Brand's farming operations.

Focusing first on the second inquiry of whether the packing shed work was performed as an incident to Candy Brand's farming operations, it is well-settled with respect to packing shed work that an employer who packs produce that is grown by other farmers is not entitled to the agricultural exemption. Farmers Reservior & Irrigation Co., 337 U.S. at 766 n.15 ("[P]rocessing on a farm of commodities produced by other farmers is incidental to or in conjunction with the farming operations of the other farmers and not incidental to or in conjunction with the farming operation of the farmer on whose premises the processing is done. Such processing is, therefore, not within the definition of agriculture."); Gulf & Western Industries, Inc., 552 F.2d at 126 ("The fact that tomatoes grown by independent farmers were processed by Gulf & Western prevents it from receiving the claimed [agricultural] exemption."); 29 C.F.R. § 780.158(c) ("It must be emphasized with respect to all practices performed on products for which exemption is claimed that they must be performed only on the products produced or raised by the particular farmer or on the particular farm."). The evidence shows that Candy Brand's packing shed workers packed tomatoes grown by individuals and entities other than Candy Brand, including Dale McGinnis, Lowry Farms, Inc., A-W Produce, Inc., and others, making it impossible for Defendants to meet their

burden of proving they plainly and unmistakably fall within the agricultural exemption.

  A.  Tomatoes Grown by Dale McGinnis were Processed by Candy Brand Packing Shed Employees.

Prior to Candy Brand's formation in 2003, Dale McGinnis had been farming tomatoes in and around Bradley County, Arkansas for almost 30 years.  (Pls.' Facts ¶ 82.)  Mr. McGinnis had a small tomato packing shed on his land, but it did not have sufficient capacity to process all of the tomatoes he grew, so for years he would normally run his tomatoes through others' packing shed facilities, including Randy Clanton's.  (Pls.' Facts ¶¶ 83-84.)  Starting in 1998 and continuing through 2002, Mr. McGinnis processed the tomatoes from his farm at the Hermitage Tomato Cooperative's facility, as his farm was a member of the Cooperative and he was, individually, a board member of the Cooperative, serving as its President between 2000 and 2002.  (Pls' Facts ¶ 85.)  Randy Clanton and some of his family members, in either their individual and/or corporate capacities, were also members of the Hermitage Tomato Cooperative at that time.  (Pls.' Facts ¶ 86.)  In 2002, the Cooperative ceased operations after it defaulted on the loans it had obtained to build the packing shed facility in Hermitage, and the property was foreclosed on by the bank.  (Pls.' Facts ¶ 88.)  That facility, which the Cooperative had paid between $5 million and $6 million to build along with some adjacent properties, was purchased at the bank auction by Arkansas Tomato Shippers for approximately

$500,000.  (Pls.' Facts ¶¶ 277, 279.)  The following tomato season (2003), that

packing shed facility was operated by the newly-formed Candy Brand, which was

owned in equal parts by Arkansas Tomato Shippers and Randy Clanton Farms, Inc.

(Pls.' Facts ¶¶ 247-249.)  Beginning in 2003 and each tomato season until Candy

Brand ceased operating in 2007, tomatoes grown by Mr. McGinnis were processed

at the Candy Brand packing shed facility by Candy Brand employees.  (Pls.' Facts

¶ 92.)

The evidence in this case shows that, between 2003 and 2007, Mr. McGinnis

grew tomatoes on his land and land that was leased by others to Candy Brand, and

that those tomatoes were packed by the packing shed workers employed by Candy

Brand.  Mr. McGinnis was not an employee of Candy Brand or Arkansas Tomato

Shippers, or otherwise involved in their business operations.  (Pls.' Facts ¶ 81.)  He

was simply a farmer who needed to get his tomatoes to market.  This alone,

without even considering the evidence of additional packing work performed on

tomatoes grown by other outside farmers' such as Lowry Farms, Inc. and A-W

Produce, Inc., is sufficient to defeat the claimed agricultural exemption.  See

Farmers Reservior & Irrigation Co., 337 U.S. at 766 n.15; Gulf & Western

Industries, Inc., 552 F.2d at 126.

Although Defendants will attempt to characterize the farming of tomatoes on

Dale McGinnis's land as one in which Candy Brand simply leased the land from

him to grow tomatoes themselves (even though there were no written lease agreements), the evidence shows that Mr. McGinnis was himself the grower of the tomatoes, just as he had always been in the years prior to Candy Brand's formation.  (Pls.' Facts ¶¶ 91, 103-107.)  Between 2003 and 2007, Mr. McGinnis was intimately involved—either personally or through providing daily instructions to his long-time employee Ascencion Fonseca—in every aspect of the tomato farming operation and made almost all of the day-to-day agricultural decisions necessary to grow the crop.  (Pls.' Facts ¶¶ 103, 108-142.)

During tomato seasons between 2003 and 2007, Mr. McGinnis and Mr. Fonseca would discuss the tomato crop on a daily basis, and Mr. McGinnis would instruct Mr. Fonseca with respect to almost every agricultural task that needed to be performed on the crop, and when it should be performed.  (Pls.' Facts ¶¶ 108-142.)  Mr. McGinnis would make the agricultural decision and tell Mr. Fonseca when to begin planting seeds in the hothouse.  (Pls.' Facts ¶ 109.)  Mr. McGinnis would personally check on the temperature in the hothouse on a daily basis and adjust it himself, if necessary, or advise Mr. Fonseca to do so.  (Pls.' Facts ¶¶ 110-111.)  He would check on the growth of the tomato plants in the hothouse and tell Mr. Fonseca when to move the plants from one hothouse to the other after the plants had grown sufficiently.  (Pls.' Facts ¶¶ 112-114.)  Mr. McGinnis would make the decision as to when to apply fungicide, and when to apply fertilizer and

what type and quantity to use, and instruct Mr. Fonseca accordingly.  (Pls.' Facts

¶¶ 115-117.)  Mr. McGinnis personally chiseled, disced, and loosened the soil in

preparation for the tomato plants because he did not like others using his tractor.

(Pls.' Facts ¶¶ 120-121.)

Before the tomato plants were ready to be transplanted from Mr. McGinnis's

hothouse to the fields, Mr. McGinnis would tell Mr. Fonseca when to lay the

plastic in the fields, would tell him how much to use, would show Mr. Fonseca

how he wanted the plastic laid, and would oversee his work.  (Pls.' Facts ¶¶ 122-

123.)  He would also instruct Mr. Fonseca on when to lay the irrigation system and

how to adjust the irrigation system and water levels in the fields.  (Pls.' Facts ¶¶

124-125.)  If items such as chicken litter or lime were needed, Mr. McGinnis

would personally contact the supplier and arrange for it to be delivered.  (Pls.'

Facts ¶ 126.)  Mr. McGinnis and Mr. Fonseca would determine when it was time to

transplant the tomato plants from the hothouse to the fields.  (Pls.' Facts ¶ 127.)

Mr. McGinnis would then instruct Mr. Fonseca as to how much space there should

be between tomato plants in the field, oversaw Mr. Fonseca's work in planting the

tomatoes in the field, and told Mr. Fonseca when to begin staking the tomato

plants.  (Pls.' Facts ¶¶ 128-129, 132.)  If Mr. McGinnis found plants that had been

damaged by animals or insects, he instructed Mr. Fonseca to plant new ones.  (Pls.'

Facts ¶ 130.)  Until 2005, Mr. McGinnis would personally apply fungicide to the

tomato crop.  (Pls.' Facts ¶ 131.)  Mr. Fonseca was not permitted to spray the

tomato plants with chemicals without first obtaining Mr. McGinnis's permission.

(Pls.' Facts ¶ 136.)  Finally, Mr. McGinnis would tell Mr. Fonseca which parts of

the fields should be picked, would discuss the weather conditions with Mr.

Fonseca and their effect on the work in the fields, and would sometimes tell Mr.

Fonseca to not go out to the fields because of the weather.  (Pls.' Facts ¶¶ 140-

142.)

     In short, every major and minor agricultural decision made with respect to

the tomato crop was made by Dale McGinnis, who was the actual farmer of the

crop, not Candy Brand.    Mr. McGinnis was not simply someone who rented land

to Candy Brand and did no farming.  For example, unlike with respect to Mr.

McGinnis's land, Candy Brand entered into actual written lease agreements with

Don Hamilton and Wayne Sinclair, individuals whose land Dale McGinnis had

farmed prior to Candy Brand's formation in 2003.  (Pls.' Facts ¶¶ 98-99; Exhs.

174, 175.)  After Candy Brand's formation, that land was farmed by Mr. McGinnis

the same way it had always been, and Mr. McGinnis was paid for tomatoes

harvested and packed from that land.  (Pls.' Facts ¶¶ 100-101.)  If the "lease"

agreement between Dale McGinnis and Candy Brand was truly only a lease of land

arrangement, there is no conceivable reason to pay Mr. McGinnis for tomatoes

grown on Candy Brand's Hamilton and Sinclair leases, unless Mr. McGinnis was the farmer of those tomatoes.

Moreover, evidence shows that Dale McGinnis, at least on his federal tax returns, also considered himself to be the farmer of the tomato crop. On his federal tax returns, which were signed under the penalty of perjury, Mr. McGinnis listed his occupation as "farming." (Pls.' Facts ¶ 93; Exhs. 191, 192, 193.)[11] Mr. McGinnis also attached to his federal tax returns a "Schedule F," listing profit and loss from farming, and answered "yes" to the question "Did you 'materially participate' in the operations of this business?" (Pls.' Facts ¶ 94; Exhs. 191, 192, 193.) On the Schedule F attached to Dale McGinnis' federal tax return for 2004 and 2005, Mr. McGinnis also filled out the section entitled income from "sales of livestock, produce, grains and other products you raised," and reported net farm losses indicating "All investment is at risk." (Exhs. 192, 193 (emphasis added).) The fact that Mr. McGinnis's investment was "at risk" was proven when, after it ceased operations in 2007, Candy Brand failed to pay Mr. McGinnis in full for his tomato crop. (Pls.' Facts ¶ 102.) Finally, Mr. McGinnis testified that he never received an IRS 1099 form from Candy Brand reporting the income from the

---

[11] Mr. McGinnis only produced unsigned copies of his federal tax returns in discovery. However, he acknowledged during deposition that the unsigned copies he produced are the same as the original versions signed under the penalty of perjury that were sent to the IRS. McGinnis Dep. at 191, 201, 207-208.

"lease," further indication that he was actually engaged in growing and selling tomatoes as opposed to renting land.

There is also evidence that Candy Brand considered Mr. McGinnis a grower. Mr. McGinnis was personally involved in the selection of the people who would work on his crop, even to the point of personally faxing lists of workers to Candy Brand's H-2A processing agent.  (Pls.' Facts ¶¶ 134-135, 143, 145; Exhs. 176, 177.)  The individuals selected to work on his farm lived in houses that Mr. McGinnis owned personally.  (Pls.' Facts ¶ 144.)  Candy Brand would often send lists of workers to its H-2A processing agent that specified which individuals were designated to work at Mr. McGinnis's farm.  (Pls.' Facts ¶ 143, Exh. 26 ("Pickers-Dale"), Exh. 27, Exh. 128 ("Dale McGinnis List"), Exh. 136, Exh. 176 ("The workers are for Dale McGinnis."), Exh. 233.)  Candy Brand's office manager then sometimes followed up with the H-2A processing agents asking when Mr. McGinnis's workers would arrive.  (Exh. 27) ("[L]et me know so I can tell Mr[.] McGinnis when he will be getting workers in.")  In 2007, Candy Brand's last year of operation, the Candy Brand office manager sent an e-mail to its H-2A processing agent stating: "**One of our growers – Dale** – will be needing approximately 14 workers no later than Feb[.] 19 or 20th.  . . . He is going to make a decision on exactly how many and which ones to put on his list, and get to me tomorrow or Friday and I will forward to you."  (Exh. 145) (emphasis added).  The

office manager also wrote: "Dale got in his first group of workers last year on 3/8. Can we shoot for relatively the same time this year?" (Exh. 145.) Forms used by Candy Brand, including the "Daily Farm Ratio of Boxes to Bins" and the "Daily Farm Packout Report" also refer to Dale McGinnis ("Grower B") as a "grower." (Exh. 336) (showing "Grower A" as "Clanton", "Grower B" as "McGinnis" and "Lowry" for tomatoes grown by Lowry Farms). Again, all of these documents show that Mr. McGinnis was engaged in his own farming operation as opposed to simply being a land renter. As such, the packing by Candy Brand of tomatoes grown by Mr. McGinnis defeats Candy Brand's claimed agricultural exemption.

B.   Tomatoes Grown by Lowry Farms were Processed by Candy Brand Packing Shed Employees.

During the 2006 Arkansas tomato season, it is undisputed that Candy Brand employees packed tomatoes grown by local independent farmer Lowry Farms, Inc. (Pls.' Facts ¶ 148; Exhs. 41, 222, 261, 262, 336.) Candy Brand's records and Charles Searcy's deposition testimony show, contrary to an affidavit submitted in December 2009 by Mr. Searcy, that Candy Brand charged Lowry Farms, Inc. a packing fee associated with Candy Brand employees packing their tomatoes. (Pls.' Facts ¶ 149; Exhs. 47, 217, 218, 219, 220, 221, 223, 224.) Because the tomatoes were grown by another farmer, and the packing was not an incident to or in conjunction with Candy Brand's farming operations, the agriculture exemption does not apply. Farmers Reservior & Irrigation Co., 337 U.S. at 766 n.15; Gulf &

52

Western Industries, Inc., 552 F.2d at 126; Mitchell v. Huntsville Wholesale

Nurseries, Inc., 267 F.2d 286, 290 (5th Cir. 1959).

     C.     Tomatoes Grown by A-W Produce, Inc. were Processed by
                 Candy Brand Packing Shed Employees.

     In addition to packing tomatoes grown by Dale McGinnis and Lowry Farms,

Inc., during the months of April and May of 2005 and 2006, Candy Brand packing

shed workers in Hermitage, Arkansas also processed tomatoes grown by A-W

Produce, Inc. in Texas.  (Pls.' Facts ¶¶ 163-164; Exhs. 208, 330, 331.)  The

processing of those tomatoes was not "agriculture" within the meaning of the

FLSA overtime exemption, as it was not an incident to Candy Brand's farming

operations.  It is undisputed that, although Candy Brand shared production costs

with A-W Produce and provided A-W Produce some technical assistance in how to

grow the tomato crop in 2005, the day-to-day agricultural decisions in Texas were

made by A-W Produce personnel.  (Pls.' Facts ¶¶ 158-159; Exhs. 311, 312 (A-W

Produce field notes describing the daily steps it took related to growing the

tomatoes).)  It is also undisputed that, in 2006, Candy Brand provided no financial

or technical assistance to A-W Produce related to growing the tomato crop in

Texas that was packed at the Candy Brand packing shed facility in Arkansas.

(Pls.' Facts ¶ 162.)  It is also undisputed that, in both years, all of the labor related

to the tomato crop in Texas with respect to growing and harvesting the crop was

selected and employed by A-W Produce, and that A-W Produce used all of its own equipment to grow the tomato crop in Texas.

With respect to the 2006 tomato crop, there can be no dispute that the agricultural exemption applies, as the crop was not in any sense part of Candy Brand's farming operation. With respect to the 2005 tomato crop, <u>Mitchell v. Huntsville Wholesale Nurseries, Inc.</u>, 267 F.2d 286, 290 (5th Cir. 1959), is particularly instructive. Similar to this case, in <u>Huntsville Wholesale Nurseries</u>, Huntsville Nurseries, located in Huntsville, Alabama, processed rosebushes from contract growers located in Tyler, Texas. Huntsville provided funds to the contract growers and counsel and advice. <u>Id.</u> at 290-291. Its agreement with the contract growers provided that the crop would be "the property of Huntsville at all times and under its supervision as to the best methods of planting, production, digging, grading, packing and shipping." <u>Id.</u> at 288-289 n.2. However, the Fifth Circuit held the agricultural exemption did not apply, finding that while it was true Huntsville provided counsel and advice and advanced funds to grow the crop, those things "are not farming in the sense of the statutory exemption," particularly given the 500 mile difference between the farm and the warehouse facility. <u>Id.</u> at 291. Similarly, even though Mr. Clanton may have provided some counsel and advice during the 2005 season and Candy Brand shared in some of the costs associated with growing the crop that year, the tomatoes were grown some 700

miles away from Candy Brand's packing facility, with A-W Produce making all the day-to-day agricultural decisions and using its own employees and equipment to grow the tomatoes. That type of situation, like <u>Huntsville</u>, in not "agriculture" within the sense contemplated by the FLSA exemption. Rather, Candy Brand's involvement in the 2005 Texas crop was more akin to an investment than a farming operation. In fact, despite the fact that he was the individual who provided the technical assistance to A-W Produce, Randy Clanton did not consider Candy Brand to be the farmer of the Texas crop, having testified at his deposition that Candy Brand never had any operations in any states other than Arkansas and all tomatoes grown by Candy Brand were grown in Arkansas. (Pls.' Facts ¶ 157.)

D.    <u>Other Outside Tomatoes Were Processed by Candy Brand Packing Shed Workers.</u>

Between 2003 and 2007, Candy Brand made additional, "outside purchases" of tomatoes that were grown by other farmers and then re-packed by Candy Brand packing shed workers. (Pls.' Facts ¶¶ 150-151.) Workers report receiving tomatoes in the packing shed in boxes other than the standard Candy Brand box, re-packing those tomatoes into Candy Brand boxes, and then burning the other boxes after re-packing was complete. (Pls.' Facts ¶¶ 152-153.) Defendants admit as much in the statement of facts accompanying their own summary judgment filing on this issue, but argue that such purchases were minimal (Doc. 158 ¶¶ 14-15.) However, Charles Searcy's statement in his affidavit that, although Candy

Brand purchased and then sometimes repacked tomatoes grown by outside farmers, he feels confident such activities were limited in scope, is difficult to reconcile with Candy Brand's federal tax returns showing outside purchases of produce totaling almost $970,000 in 2006 and over $715,000 in 2007.  (Exhs. 287, 288.) These outside purchases amounted to over 10% of Candy Brand's <u>total operational expenses</u> in 2006 and 2007.  (Exhs. 287, 288.)  (Candy Brand tax returns showing total expenses in 2006 and 2007 of $7.75 million and $6.75 million, respectively).) Such outside purchases, which don't even include the tomatoes farmed by Dale McGinnis and A-W Produce, hardly constitute a "limited scope" such that Candy can meet its burden that it clearly and unmistakably is entitled to the agricultural exemption.

Further, the normal six to eight week tomato harvest season in Arkansas occurs in June and July. (Pls.' Facts ¶ 154.)  Yet Candy Brand's records show a large amount of re-packing work occurring during months when no tomatoes are harvested in Arkansas. (Pls.' Facts ¶¶ 155-156; <u>see, e.g.</u>, Exhs. 42, 43, 264, 269, 270, 331.)  Because no tomatoes grown by Candy Brand were harvested during those months, Candy Brand concedes that packing and re-packing of produce that occurred during those months would have been performed on produce that was not grown by Candy Brand. (Pls.' Facts ¶¶ 154, 156.)

Simply stated, the combination of tomatoes grown by Dale McGinnis, Lowry Farms, Inc., A-W Produce, Inc. and other outside tomato farmers that were packed at the Candy Brand packing shed facility shows that packing shed employees were not employed by a farmer as an incident to <u>that farmer's</u> farming operations.  As such, the agriculture exemption is inapplicable and the Defendants were required to pay overtime wages to their packing shed workers.  <u>Farmers Reservior & Irrigation Co.</u>, 337 U.S. at 766 n.15; <u>Gulf & Western Industries, Inc.</u>, 552 F.2d at 126; <u>Huntsville Wholesale Nurseries, Inc.</u>, 267 F.2d at 290.

E.    <u>Candy Brand Has Taken the Position in Other Contexts That it Was Not a "Farmer."</u>

In addition to being unable to prove entitlement to the agricultural exemption because its packing shed workers were not employed as an incident to Candy Brand's own farming operations, Candy Brand at one point took the position with the United States Department of Agriculture that it was not even a "farmer," further calling into question its claim to the agricultural exemption. Around the time Candy Brand formed, Charles Searcy and Randy Clanton set up almost a dozen different limited liability companies in an attempt to maximize their federal government disaster subsidy and crop insurance payments.  (Pls.' Facts ¶ 165; Exhs. 194, 202.)  Exhibit 202 shows how the corporate structuring was designed as an attempt to maximize government subsidies, with Candy Brand providing financing to the different farm entities to engage in the growing

57

operations.  (Exh. 202.)  The entities all applied for crop insurance and two of the

entities received disaster payments totaling $80,000 from the federal government.

(Pls.' Facts ¶¶ 166-167; Exhs. 271, 272, 273, 274.)  Unhappy with a government

determination that the entities' disaster payments were capped at a single,

combined $80,000 payment, the entities appealed the decision of the USDA's

Farm Service Agency.  (Pls.' Facts ¶ 168.)  During the Farm Service Agency

appeal, Randy Clanton testified at a hearing on May 11, 2006, under oath, that

Candy Brand "did not grow anything, was not a producer," that "Candy Brand is

not a producer, never has produced anything," and that Candy Brand "never has

farmed one single acre."  (Pls.' Facts ¶ 169; Exh. 326 at pages 45-45 of 72.)  Mr.

Clanton further testified that Candy Brand "had no actual risk.  I mean it's, you

know, it doesn't have anything to lose really."  (Exh. 326 at page 52 of 72.)  Such

testimony further calls into question the Defendants' ability to prove entitlement to

the agricultural exemption since to fall within the definition of secondary

agriculture the work must be performed "by a farmer."  29 U.S.C. § 203(f);

Farmers Reservior & Irrigation Co., 337 U.S. at 762, 766-768.

        For all of the reasons outlined above, summary judgment should be entered

for the Plaintiffs, FLSA opt-in Plaintiffs, and Rule 23 Class II members with

respect to their claims of entitlement to overtime wages when they were employed

in the Defendants' packing shed operations.

**VI.   DEFENDANTS' WILLFUL VIOLATIONS OF THE FLSA TRIGGER THE THREE-YEAR STATUTE OF LIMITATIONS FOR THE PLAINTIFFS' AND OPT-IN PLAINTIFFS' FLSA CLAIMS.**

While the statute of limitations applicable to FLSA claims is normally two (2) years, 29 U.S.C. § 255(a), the limitations period is extended to three (3) years if the Plaintiff can prove that the Defendants' violation of the Act was "willful."  Id. ("[A] cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]").  A "willful" violation is one where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988).  The regulations interpreting the FLSA state that a violation shall be deemed "in reckless disregard … if the employer should have inquired further into whether its conduct was in compliance with the Act" and failed to do so.  29 C.F.R. § 578.3 (c)(3).

Defendants knew, or should have known, that their failure to reimburse H-2A workers' pre-employment expenses violated the FLSA.  Arriaga v. Florida Pacific Farms, L.L.C., 305 F. 3d 1228 (11th Cir. 2002); Martinez-Bautista v. D&S Produce, 447 F. Supp. 2d 954 (E.D. Ark. 2006).  Between 2003 and 2007, each time that Candy Brand applied for H-2A workers, the USDOL sent acceptance letters that advised Candy Brand of its obligations under the FLSA to reimburse H-2A workers for pre-employment expenses incurred for the employer's benefit.

(Pls.' Facts ¶¶ 75, 77.)  Defendants received no fewer than 10 of these letters from the USDOL advising them of FLSA requirements related to reimbursement of expenses for H-2A workers.  (Exh. 230 (2003 season), Exh. 232 (2003 season), Exh. 100 (2004 season), Exh. 103 (2005 season), Exh. 106 (2005 season), Exh. 110 (2006 season), Exh. 114 (2006 season), Exh. 118 (2007 season), Exh. 120 (2007 season), Exh. 236 (2007 season).)

In order to understand and ascertain its obligations pursuant to the FLSA, Candy Brand stated that it relied solely on the advice of AgWorks and ILMC, both of whom informed Candy Brand of its FLSA obligations.  (Pls.' Facts ¶ 60; Exh. 197 at page 7 of 12 (Candy Brand Answers to Interrogatories).)  Both AgWorks and ILMC provided Candy Brand with technical assistance related to compliance with federal labor laws, including those associated with the H-2A visa program. (Pls.' Facts ¶ 64, 66.)  As a client of ILMC, Candy Brand was required to review and sign an H-2A Compliance Review Checklist that outlined a number of legal requirements for the employment of H-2A visa workers, including compliance with the FLSA.  (Pls.' Facts ¶ 67.)   ILMC's Compliance Review Checklist was based on a form supplied by the USDOL, which both ILMC and the USDOL itself also provided to Candy Brand.  (Pls.' Facts. ¶¶ 68, 69; Exhs. 159, 160, 244.) From as early as November, 2005, ILMC mailed Candy Brand several letters warning them of legal issues related to the failure to reimburse H-2A workers for

expenses to obtain their visas and travel to the United States.  (Pls.' Facts ¶ 71; Exhs. 29, 166, 167.)  And, as early as March, 2003, AgWorks sent Candy Brand a set of requirements associated with the employment of H-2A workers, including a summary of the <u>Arriaga</u> decision.  (Pls.' Exh. 13 at page 9-10.)  Charles Searcy and Randy Clanton, individuals at Candy Brand authorized to investigate Candy Brand's compliance with the FLSA and make decisions that would affect the entire Candy Brand workforce, were aware of the <u>Arriaga</u> decision and discussed its implications with each other.  (Pls.' Facts ¶¶ 72, 73.)  Without reading the <u>Arriaga</u> opinion or consulting an attorney, the two decided that the opinion simply did not apply to their operations.  (Pls.' Facts ¶ 74.)

Defendants were also aware that, in certain circumstances, packing shed workers should be paid overtime wages, but simply made a decision to not pay workers the overtime premium.  (<u>See, e.g.</u>, Exh. 202 ("Candy Brand LLC will supply all labor for production and processing (H2A workers) – no over time wages.  *Legal advice on how to do this without problems.*") (emphasis in original).)  In the set of requirements associated with the employment of H-2A workers that AgWorks sent Candy Brand in March of 2003, AgWorks advised Candy Brand that overtime wages were due to packing shed workers who packed for other growers.  (Pls.' Facts ¶ 65; Exh. 13 at page 6) ("Time-and-one-half after 40 hours is not required in agriculture.  However, if you have a packing house and pack for

**other** growers, time-and-one-half may apply in the packing houses.  When you

pack for another grower, any workers who work in the field and packing house

must have **all** hours worked during that week in all occupations count towards the

first 40 hours.") (emphasis in original).)   As discussed in Section V.A.-V.D.

above, Candy Brand packed and re-packed tomatoes grown by Dale McGinnis,

Clay Lowry, A-W Produce, and other outside growers, yet still refused to pay its

packing shed workers any overtime pay.  (Pls.' Facts ¶¶ 79-161.)  Defendants

knew that their failure to pay overtime was an area of legal concern.  (Exh. 202.)

Nonetheless, Defendants did not investigate whether their failure to make overtime

payments complied with the FLSA, and neither conducted nor relied on legal

research in determining that they did not owe workers overtime pay.  (Pls.' Facts

¶¶ 61, 63.)  Based on this evidence, it is clear that Defendants knew of the FLSA's

reimbursement and overtime requirements, yet refused to bring themselves in

compliance with the Act.  This knowing refusal triggers the three year limitations

period for willful violations.  Richland Shoe, 486 U.S. at 133; Dole v. Elliott

Travel & Tours, Inc., 942 F.2d 962, 967 (6th Cir. 1991) ("When as here a company

president has actual knowledge of FLSA's requirements and fails to comply, the

company has acted willfully.").

 At a minimum, Defendants "showed reckless disregard for the matter of

whether [their] conduct was prohibited by the [FLSA]."  Richland Shoe, 486 U.S.

at 133.  The USDOL acceptance letters, H-2A compliance review checklists from their agent and USDOL, as well as letters and other materials received from their agents provided the Defendants with, at the very least, a reason to inquire further into the legality of their actions.  Defendants failed to investigate their duties under the FLSA and continually failed to reimburse employees for the expenses they incurred, and continually failed to pay packing shed workers overtime wages.  This was done despite numerous warnings of their obligations to do so, establishing the Defendants' willful violation of the FLSA.  Brown v. L & P Indus., No. 5:04-CV-0379-JLH, 2005 U.S. Dist. LEXIS 39920, at *27-*34 (E.D. Ark. Dec. 21, 2005) (finding willfulness where "Defendants knew how to seek accurate information on this legal issue, but nevertheless refused, over a period of several years, to make even a minimal effort to do so.").

Defendants admit that they did not reimburse Plaintiffs for passports, visas and visa processing, transportation, border crossing expenses, or transportation and subsistence costs after their first workweek.  (Pls.' Facts ¶ 55.)   They also admit that packing shed workers were never given overtime pay, leaving no issue of material fact.  (Pls.' Facts ¶ 79.)  Because Defendants failed to reimburse Plaintiffs' pre-employment costs in knowing and express defiance of the FLSA and because Defendants knowingly failed to give packing shed workers legally required overtime, the Plaintiffs and opt-in Plaintiffs are entitled as a matter of law

to the benefit of the three year statute of limitations with respect to their FLSA claims.

## VII.   THE PLAINTIFFS' AND OPT-IN PLAINTIFFS ARE ENTITLED TO LIQUIDATED DAMAGES ON THEIR FLSA CLAIMS.

Defendants cannot meet their burden of demonstrating they acted reasonably and in good faith in violating the FLSA, mandating a payment of liquidated damages to Plaintiffs.  "Any employer who violates the [minimum wage or overtime provisions] of the FLSA shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  Liquidated damages are not punitive, but rather are "intended in part to compensate employees for delay in payment of wages owed under the FLSA."  Hultgren v.County of Lancaster, 913 F.2d 498, 509 (8th Cir. 1990) (citing Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 707 (1945)).  An award of liquidated damages is mandatory under 29 U.S.C. § 216(b) absent an employer's showing of good faith and reasonable grounds for the belief that it was not in violation of the FLSA.  Braswell v. City of El Dorado, 187 F. 3d 954, 957 (8th Cir. 1990).  If the employer fails to come forward with plain and substantial evidence to satisfy both the good faith and reasonableness requirements, the court *must* award liquidated damages.  Williams v. Tri-County Growers, Inc., 747 F.2d 121, 129 (3d Cir. 1984).

Defendants cannot meet the heavy burden they carry of proving their actions were taken in good faith.  The employer's burden is "a difficult one, with double damages being the norm and single damages being the exception."  Chao v. Barbeque Ventures, 547 F. 3d 938, 941 (8th Cir. 2008).  In order to meet the good faith requirement, an employer must establish that they honestly intended to ascertain and follow the provisions of FLSA.  Hultgren, 913 F. 2d at 509.  In this case, Defendants were informed of their obligations to pay packing shed workers overtime and to reimburse their H-2A employees' pre-employment expenses, but they ignored those instructions entirely and simply refused to comply with the FLSA.  (Pls.' Facts ¶¶ 64-69, 71, 75-77; Exhs. 13, 29, 166, 167.)  Not only did their actions run counter to the FLSA requirements they had been alerted to by the agents who helped them navigate the H-2A process, but Defendants took no additional steps to confirm their actions were appropriate.  (Pls.' Facts ¶¶ 61, 63.)  Lack of knowledge is not enough to establish good faith.  Chao, 574 F.3d at 941.  To carry their burden, "a defendant employer must show that he took affirmative steps to ascertain the Acts requirements."  Id. at 942 (quoting Martin v. Cooper Elec. Supply Co., 940 F. 2d 896, 908 (3d Cir. 1991); see also Lockwood v. Prince George's County, No. 99-2487, 2000 U.S. App. LEXIS 15302, at *18 (4th Cir. June 29, 2000) ("We have previously held that an employer may not take an 'ostrichlike' approach to the FLSA by 'simply remaining blissfully ignorant of

FLSA requirements.'") (quoting <u>Roy v. County of Lexington</u>, 141 F.3d 533, 548 (4th Cir. 1998)).  Defendants cannot show they took any appropriate, affirmative measures to determine their obligations under the FLSA.

Nor can Defendants meet their burden of establishing they acted reasonably. In order to avoid an award of liquidated damages, an employer must establish that their actions were objectively reasonable.  <u>Hultgren</u>, 913 F. 2d at 509.  Mere ignorance is not enough to exonerate an employer.  <u>Chao</u>, 537 F. 3d at 942; <u>Barcellona v. Tiffany English Pub, Inc.</u>, 597 F.2d 464, 468 (5th Cir. 1979) ("Even inexperienced businessmen cannot claim good faith when they blindly operate a business without making any investigation as to their responsibilities under the labor laws."); <u>Piceno v. De Jong Brothers Farms, Inc.</u>, No. 89-C-7197, 1991 U.S. Dist. LEXIS 2903, at *7 (N.D. Ill. Mar. 12, 1991) ("It has long been the law that workers . . . who pack produce of farmers other than their employer are entitled to overtime.  [The employer's] admitted ignorance of that unambiguous law is no good faith defense to meeting its obligations under the FLSA.").  Because the Defendants actions were contrary to the FLSA and contrary to the instructions they were given, they were not objectively reasonable.

Furthermore, because the Defendants willfully violated the FLSA, they cannot establish they acted with good faith and reason.  It is "hard to mount a serious argument that an employer who has acted in reckless disregard of its FLSA

obligations has nonetheless acted in good faith." <u>Jarrett v. ERC Props</u>., 211 F.3d 1078, 1084 (8th Cir. 2000).  Defendants knew of potential issues related to the FLSA (<u>see, e.g.</u>, Exh. 202), but simply disregarded them.  Defendants cannot meet the high burden required to avoid the mandatory liquidated damages imposed by the FLSA.  Accordingly, the Plaintiffs and opt-in Plaintiffs should be granted summary judgment on this issue and should be awarded liquidated damages in an equal amount to the unpaid minimum and overtime wages they are due under the FLSA.

## VIII.  DEFENDANTS BREACHED THE PLAINTIFFS' AND CLASS I MEMBERS' H-2A WORK CONTRACTS BY FAILING TO PAY PROPER TRANSPORTATION AND SUBSISTENCE EXPENSES AT BOTH THE 50% POINT OF THE H-2A CONTACT PERIOD AND UPON COMPLETION OF THE H-2A CONTRACT.

As already discussed, the promises contained in the ETA 750 and ETA 790 clearance orders submitted by the Defendants to obtain H-2A workers, along with the federal regulations governing the H-2A program, together created the enforceable employment agreement between the Plaintiffs, the class members, and the Defendants.  <u>See</u> <u>Salazar-Calderon v. Presidio Valley Farmers Ass'n</u>, 765 F. 2d 1334, 1341-42 (5th Cir. 1985); <u>Western Colorado Growers Ass'n v. Marshall</u>, 473 F. Supp. 693, 696 (D. Colo. 1979) ("clearance order is essentially an offer for a contract of employment"); 29 C.F.R. § 655.102(b)(14) (1987).  The clearance orders submitted by the Defendants, as well as the H-2A regulations, required the

Defendants, upon completion by the worker of 50% of the contract period, to reimburse their H-2A workers for the costs of their transportation to Arkansas and to pay them a daily subsistence amount based on the number of days spent traveling.  See, e.g., Exh. 229 ("After fifty percent of the employment period is complete, the employer will reimburse the worker for reasonable cost of transportation [sic] and subsistence from the place of recruitment to the grower's location."); 20 C.F.R. § 655.102(b)(5)(i) (requiring reimbursement for transportation and daily subsistence costs incurred from the place "from which the worker has come to work for the employer to the place of employment").  Despite these requirements, Defendants' policy and practice was to pay the H-2A workers who are Class I members only $100 for the costs of transportation from their homes in Mexico to the Defendants' workplace in Hermitage, Arkansas, regardless of the fact that the actual costs of transportation incurred by the class members exceeded $100.  (Pls. Facts ¶¶ 172, 174.)  Defendants' agents provided them with detailed instructions and a worksheet describing and demonstrating how to properly calculate travel reimbursement under the H-2A regulations, outlining expenses which far exceeded $100.  (Pls.' Facts ¶¶ 9, 10, 170, 171; Exhs. 14, 20, 162, 163, 164, 165.)  Nevertheless, Candy Brand did not take into account Plaintiffs' actual costs for transportation, and continued to reimburse them a flat

rate of $100 every year after the 50% point of the contract was completed.[12]  (Pls.'
Facts ¶ 173.)

In addition to not providing full reimbursement for transportation costs, the
Defendants "srew[ed] up" and completely ignored their requirement to pay the H-
2A class members for the costs of daily subsistence based on the number of days
they spent traveling from their homes to Arkansas.  (Pls.' Facts ¶ 173; Candy
Brand/ATS/Searcy Dep. Vol. I at 229-230 ("Just a screw-up on our part.").)  The
H-2A class members typically spent a minimum of 3 days traveling from their
homes to the United States Consulate in Monterrey, and then on to Hermitage.
(Pls.' Facts ¶¶ 168, 169; Exh. 10.)  As such, they should have been paid the daily
subsistence rate set forth in the Federal Register for the year in which they were
employed, times three days.  See, e.g., 71 Fed. Reg. 13633, 13635 (Mar. 16, 2006)
(setting the subsistence rate for the 2006 season at $9.30 per day).  Defendants'
failure to pay the H-2A class members any subsistence payment upon completion
of 50% of the contract period was a clear breach of the employment agreement.

Similar to the requirement that H-2A workers be reimbursed for the costs of
transportation and daily subsistence upon completion of 50% of the contract

---

[12]   In 2007 the Defendants provided and paid for a bus to transport their H-2A
workers from the United States Consulate in Monterrey, Mexico to Arkansas.
However, Defendants failed to pay for or otherwise reimburse the class members at
the 50% period of the contract for the costs of transportation incurred to travel
from their homes to the Consulate in Monterrey.  (Pls.' Facts ¶ 172.)

period, H-2A workers who complete the work contract period must be provided

return transportation and the costs of daily subsistence "from the place of

employment to the place from which the worker . . . came to work for the

employer." 20 C.F.R. § 655.102(5)(ii) (1987); Exh. 229 (clearance order) ("Upon

completion of the employment period, the employer will pay for the worker's

reasonable cost of return transportation and subsistence to the place of recruitment

. . . ."). While there is some dispute at to whether the Defendants provided or

otherwise paid for return transportation for the H-2A class members upon

completion of the contract to just the U.S.-Mexico border or all the way to

Monterrey, Mexico, there is no dispute that the Defendants did not pay for any

return transportation from Monterrey, Mexico to the H-2A class members' home.

(Pls.' Facts ¶ 175.) That was a clear violation of the H-2A regulations and a

breach of the employment contract. Likewise, it is undisputed that Candy Brand

"screwed up" and never paid any of the H-2A class members for the costs of daily

subsistence upon completion of the contract period, again in clear violation of the

H-2A regulations and the employment contract. (Pls.' Facts ¶ 176.)

   Defendants have, by their own admission, failed to follow H-2A regulations

for reimbursement of travel and subsistence costs, thereby violating the H-2A

regulations and the class members' employment contracts. As such, the Plaintiffs

and H-2A class members are entitled to summary judgment on this issue.

## CONCLUSION

For the foregoing reasons, Plaintiffs Motion for Partial Summary Judgment Related to Violations of the Fair Labor Standards Act and the H-2A Employment Contract should be granted.

Respectfully Submitted,

/s/ James M. Knoepp
James M. Knoepp
Georgia Bar Number 366241
*Admitted Pro Hac Vice*
Email:  jim.knoepp@splcenter.org
Michelle R. Lapointe
Georgia Bar Number 007080
*Admitted Pro Hac Vice*
Email:  michelle.lapointe@splcenter.org
Daniel Werner
Georgia Bar Number 422070
*Admitted Pro Hac Vice*
Email: daniel.werner@splcenter.org
Immigrant Justice Project
Southern Poverty Law Center
233 Peachtree Street NE, Suite 2150
Atlanta, GA  30303
Telephone:  (404) 521-6700
Facsimile:   (404) 221-5837

Edward Tuddenham
Texas Bar Number 20282300
*Admitted Pro Hac Vice*
Email: etudden@io.com
228 W. 137th Street
New York, NY 10030
Telephone: (512) 413-4863
Facsimile: (512) 443-4258

John L. Burnett

Arkansas Bar Number 77021
Email:  jburnett@laveyandburnett.com
Lavey and Burnett
904 W. 2nd Street
Little Rock, AR  72201
Telephone: (501) 376-2269
Facsimile: (501) 372-1134

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I have this date electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys for the Defendants:

Hani W. Hashem
Hashem Law Firm, PLC
P.O. Box 739
Monticello, Arkansas  71657
hwh@hashemlawfirm.com

Charles Darwin "Skip" Davidson
Paul Davidson
Davidson Law Firm, Ltd.
P.O. Box 1300
724 Garland Street
Little Rock, Arkansas  72201
skipd@dlf-ar.com
pauld@dlf-ar.com

F. Mattison Thomas III
101 Main Street, Suite D
El Dorado, Arkansas  71730
matt@southarklegal.com

/s/ James M. Knoepp_____

this 2nd day of August, 2010.